Filed 4/7/15 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LAMAR JOHNSON, <br><br> Defendant and Appellant. | A136573 <br><br> (San Mateo County <br> Super. Ct. No. CIV-506664) |
| In re LAMAR JOHNSON, <br><br> on Habeas Corpus. | A140310, A143775 <br><br> ORDER MODIFYING OPINION <br> AND DENYING REHEARING <br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the written opinion filed on March 13, 2015, is modified by deleting section II.A.5. and replacing it with the following:

> 5.   Johnson's ex post facto, double jeopardy, and due process challenges are barred by our state Supreme Court precedent.

Johnson asserts that the SVPA is punitive in intent and effect and thus runs afoul of the ex post facto and double jeopardy clauses of the United States Constitution. He also argues the statute violates SVPs' due process rights by impermissibly shifting the burden to them to prove release from indeterminate commitment is appropriate. Johnson

---

[*]   Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

concedes that our state Supreme Court rejected these same arguments in *McKee I*, *supra*, 47 Cal.4th at pp. 1188-1195, but he states that he wishes to preserve the arguments in the event he seeks federal habeas relief.  Given controlling Supreme Court precedent, his claim fails.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

This modification does not change the judgment.  (Cal. Rules of Court, rule 8.264(c)(2).)  The petition for rehearing is denied.


Dated:_____                      _____P.J.

2

Trial Court:                    San Mateo County Superior Court

Trial Judge:                    Honorable Robert Atack

Counsel for Appellant:          Michele Kemmerling, under appointment by the First
                                District Appellate Project

Counsel for Respondent:         Kamala D. Harris, Attorney General, Dane R. Gillette,
                                Chief Assistant Attorney General, Gerald A. Engler,
                                Senior Assistant Attorney General, Lawrence K.
                                Sullivan, Supervising Deputy Attorney General,
                                Bridget Billeter, Deputy Attorney General

Filed 3/13/15 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LAMAR JOHNSON,<br><br>        Defendant and Appellant. | A136573<br><br>(San Mateo County<br>Super. Ct. No. CIV-506664) |
| In re LAMAR JOHNSON,<br><br>        on Habeas Corpus. | A140310, A143775 |

Lamar Johnson was involuntarily committed to a state mental hospital after a jury found him to be a sexually violent predator (SVP). He appealed, and he later filed two petitions for a writ of habeas corpus. We consolidated the actions after issuing orders to show cause. In his appeal, Johnson argues (1) insufficient evidence supports the jury's determination that he is an SVP; (2) the jury was improperly instructed on the burden of proof; and (3) the Sexually Violent Predator Act (the SVPA or Act)[1] is unconstitutional. In both habeas petitions, he argues that his commitment must be vacated because the

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

    [1] Welfare and Institutions Code, section 6600 et sequitur. All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

newest edition of the Diagnostic and Statistical Manual of Mental Disorders[2] (DSM), a manual published by the American Psychiatric Association to identify criteria for the classification of mental disorders, does not allude to the psychiatric diagnosis upon which his commitment was based: "paraphilia[,] not otherwise specified, . . . with non-consenting persons." We reject these arguments, affirm the judgment, and in the published portion of our decision deny the habeas petitions.

## I.
## BACKGROUND

### A.    The Statutory Background.

Under the SVPA, a person who is found to be an SVP beyond a reasonable doubt by a unanimous jury may be involuntarily committed to a state mental hospital for an indefinite term. (§§ 6603, subd. (d), 6604.) The statute defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victim and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."[3] (§ 6600, subd. (a)(1).)

SVPs are entitled to have their mental condition examined once per year (§ 6604.9, subd. (a)), and they can obtain release in two ways. First, if the Department of State Hospitals (DSH) determines that the SVP's diagnosed mental disorder "has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community," the DSH must forward a report and

---

[2] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (sometimes referred to as the DSM-5).

[3] As originally enacted (Stats. 1995, ch. 763, § 3), the SVPA set a two-year term of involuntary confinement that could be extended. (Former §§ 6600, subd. (a), 6604.) In 2006, California voters passed Proposition 83, which changed the term to be an indefinite period of commitment. (People v. McKee (2010) 47 Cal.4th 1172, 1183-1184 (McKee I).) In addition, although it originally required an SVP to have committed sexually violent offenses against two or more victims, the Act now requires only one victim. (§ 6600, subd. (a)(1).)

2

recommendation for conditional release, and the trial court must set a hearing to consider conditional release. (§ 6607.) Second, the SVP may petition the court for a conditional release with or without the concurrence of the DSH. (§ 6608, subd. (a).) Upon receiving a petition filed without the DSH's concurrence, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (*Ibid.*) If the court determines the petition is not frivolous, it must set a hearing. (§ 6608, subds. (b)(1) & (4), (c)(1).) If the SVP's petition is denied, the SVP may not file a new application until one year has elapsed from the date of the denial. (§ 6608, subd. (j).)

At a hearing to consider an SVP's conditional release, the trial court must determine whether "it is likely that [the committed person] will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (g).) Ordinarily, the burden is on the SVP to prove by a preponderance of the evidence that conditional release is appropriate. (§ 6608, subd. (k).) But when the DSH issues a report stating that "conditional release to a less restrictive alternative is in the best interest of the person and that conditions can be imposed that would adequately protect the community," the burden is on the state to prove by a preponderance of the evidence that conditional release is not appropriate. (*Ibid.*)

Not surprisingly, the constitutionality of the SVPA and other states' civil-commitment schemes has been challenged. Our state Supreme Court has upheld the SVPA against due process and equal protection challenges, and it did so by adopting the same analysis that applies under the United States Constitution. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1152, fn. 19.) Under both the federal and state Constitutions, a finding of dangerousness alone is insufficient to justify an involuntary commitment. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 356-357 (*Hendricks*); see *Hubbart,* at p. 1152, fn. 19.) Rather, a state can only involuntarily commit someone who has a "serious mental illness, abnormality, or disorder" that separates the person "from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Kansas v.*

*Crane* (2002) 534 U.S. 407, 413 (*Crane*).) "If . . . civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." (*Hendricks*, at p. 373 (conc. opn. of Kennedy, J.); see also *Crane,* at p. 412.)

>    B.    *The Factual Background.*

Between 1983 and 1992, Johnson committed sexually violent offenses against three victims. In 1984, he pleaded guilty to one count of assault with intent to commit rape (Pen. Code, §§ 220, 261) of a 24-year-old female. While he was awaiting sentencing for that crime, he raped a 15-year-old girl who lived in his apartment complex, and he later pleaded to unlawful sexual intercourse with a minor (Pen. Code, § 261.5). He served time in prison for those two convictions but was released on parole in May 1985. In March 1992, Johnson sexually assaulted yet another woman, and he was subsequently convicted of two counts of rape (Pen. Code, § 261, subd. (a)) and one count each of assault with intent to commit sodomy (Pen. Code, §§ 220, 286), forcible oral copulation (Pen. Code, § 288a), and assault with intent to commit rape (Pen. Code, §§ 220, 261). He was sentenced to state prison for 36 years and remained incarcerated for over 17 years, but he was scheduled to be released on parole on June 28, 2011.

The day before Johnson's scheduled release date, the San Mateo County District Attorney petitioned to have Johnson committed to a state hospital as an SVP. A jury trial ensued, and four psychologists testified as experts: Deirdre D'Orazio, Ph.D., and Jesus Padilla, Ph.D., testified for the state, and Brian Abbott, Ph.D., and Christopher Heard, Ph.D., testified for Johnson.

The state's experts, Drs. D'Orazio and Padilla, diagnosed Johnson with "paraphilia[,] not otherwise specified, . . . with non-consenting persons." We shall follow the lead of at least one of the experts who testified below and will refer to this diagnosis as "paraphilic coercive disorder." The state's experts relied on several factors in forming the diagnosis, and they generally described it as marked by sexual arousal or gratification involving nonconsenting persons persisting over a six-month period. Johnson did not

4

object to the introduction of this testimony, and his counsel cross-examined both doctors.[4]

Johnson's experts disagreed with the state's experts about Johnson's diagnosis. Dr. Abbott testified that, although it can be a valid diagnosis, paraphilic coercive disorder is very rare, was not listed in the then-current edition of the DSM, and is controversial within the scientific community. He opined that Johnson does not have the disorder, and he questioned the factors relied upon by the state's experts in diagnosing Johnson with it. Dr. Heard testified that paraphilic coercive disorder does not exist and that an overwhelming majority of psychologists and psychiatrists has rejected it as a valid diagnosis. He further testified that, even if the disorder does exist, there is no consensus on its definition or diagnosis, and none of the factors on which the state's experts relied to diagnose Johnson with the disorder had been validated by research. Dr. Heard opined that Johnson was motivated not by paraphilia but by anger toward women, which he expressed in a violent, antisocial manner.

The edition of the DSM current at the time of Johnson's trial was the text revision of the fourth edition, published in 2000.[5] It states that "[t]he essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months." This edition of the DSM identifies eight classifications of paraphilia and also references a residual category, "Paraphilia Not Otherwise Specified," which includes paraphilias that are less frequently encountered. The state's experts asserted that

---

[4] The state's experts also diagnosed Johnson with substance dependence and a personality disorder marked by narcissistic and antisocial traits. The Attorney General does not argue that these diagnoses provide an independent basis for Johnson's commitment.

[5] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev. 2000) (sometimes referred to as the DSM-IV-TR). Throughout this opinion, references to the fourth edition of the DSM are to the text revision of the fourth edition unless otherwise indicated.

paraphilic coercive disorder falls within this residual category. After the trial, the American Psychiatric Association published a fifth edition of the DSM. The fifth edition's description of paraphilia does not reference "nonconsenting persons" as did the fourth edition's, and the fifth edition does not otherwise allude to paraphilic coercive disorder.[6]

The experts also disagreed about Johnson's risk of engaging in sexual violence if released. To assess Johnson's risk of reoffense, Dr. D'Orazio used the Static-99R, an actuarial instrument based on studies of known sex offenders that identifies factors related to reoffense. Dr. D'Orazio also used another instrument, the Structured Risk Assessment, Forensic Version, to select a reference group for Johnson and place his Static-99R score in context. Based on these two instruments, Dr. D'Orazio concluded that he falls into a high-risk group and has characteristics in common with men who have reoffended at a rate of 21 to 28 percent over a 10-year period. Dr. Padilla also used the Static-99R, as well as factors listed in another guided clinical assessment instrument, the Stable-2007, to estimate that Johnson had a 15.8 percent risk of recidivism over the next five years and a 24.3 percent chance of recidivism over the next ten years.

Johnson's experts testified that his risk of reoffense was lower. Although, as did the state's experts, Dr. Abbott used the Static-99R, he concluded that Johnson fell into the "routine corrections offender group," which has a six percent chance of reoffense over a five-year period, with the chance declining about two to four percent per year. Unlike Dr. D'Orazio, Dr. Abbott did not use the Structured Risk Assessment, Forensic Version to select a reference group, stating the instrument was experimental, and its reliability has never been tested. Dr. Heard testified that the current rate of sexual

---

[6] Prior to trial, the state moved to exclude any reference to the fifth edition of the DSM, which was in draft form at that time. The trial court granted the motion over an objection by Johnson that the exclusion would prevent him from adequately cross-examining the state's experts regarding the validity of the diagnosis of paraphilic coercive disorder. The court reasoned that the draft DSM had not yet been adopted and was subject to change. On appeal, Johnson does not argue that this ruling provides an independent basis for reversal.

6

reoffense in the United States is seven percent and that Johnson's risk was lower than that due to his age and declining sex drive. Dr. Heard did not use any sort of instrument or actuarial tool because he does not believe they provide accurate results.

The jury unanimously found Johnson to be an SVP, and the trial court imposed an indeterminate commitment. Johnson then filed a motion to strike the indeterminate commitment and to be given a two-year commitment instead, asserting that being held indefinitely would violate his constitutional rights. The court denied the motion.

II.

DISCUSSION

A.      *Johnson's Appeal.*

Johnson appeals his commitment on five grounds: (1) insufficient evidence was presented to find that he is an SVP; (2) the trial court erred in instructing on the state's burden of proof; (3) the court erred by refusing to instruct that he should be presumed not to be an SVP; (4) the SVPA violates his equal protection rights; and (5) the SVPA violates the ex post facto and double jeopardy clauses of the United States Constitution. We discuss each of these arguments in turn.

1.      The jury's determination that Johnson is an SVP is supported by substantial evidence.

Johnson contends there was insufficient evidence to support the jury's finding that he is an SVP because the state's experts failed to base their diagnoses on current psychological symptoms or behaviors and relied upon factors that were contradicted by undisputed facts.[7] He also argues that the state failed to show that he is likely to commit sexually violent offenses in the future. We are not persuaded.

In considering Johnson's challenge to the sufficiency of the evidence, we apply the familiar substantial-evidence standard. (*In re Ryan D.* (2002) 100 Cal.App.4th 854,

---

[7] Johnson does *not* contend that the state's experts were unqualified or that their testimony on the existence of paraphilic coercive disorder was improperly introduced. Nor could he, since he did not object below to these experts' qualifications or testimony. (See *People v. Dowl* (2013) 57 Cal.4th 1079, 1089 [substantial-evidence challenge based on expert's alleged inadequate qualifications is forfeited on appeal when defendant does not object to qualifications below].)

7

859.) In doing so, we must consider the entire record in the light most favorable to the judgment to determine whether it contains reasonable, credible, and solid evidence supporting the decision. "When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

As previously discussed, to establish that a person is an SVP, the state must prove that the person was convicted of a sexually violent offense against one or more victim and suffers from a currently diagnosed mental disorder that makes him or her a danger to the health and safety of others because it makes him or her likely to engage in sexually violent criminal behavior. (See § 6600, subd. (a).) To show that a person is a danger, the state need not offer "proof of a recent overt act while the offender is in custody." (§ 6600, subd. (d).) But it does need to show " 'recent objective indicia of the defendant's condition' and 'a recent objective basis for a finding that an inmate is likely to reoffend.' " (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1161.)

Johnson argues that insufficient evidence was presented to establish that he currently suffers from a diagnosed mental disorder making him a danger to others. Although he recognizes that the state's experts testified that he has paraphilic coercive disorder, he argues that their opinions were unsupported because they were based on his decades-old convictions. He contends that no evidence postdating his last offense in 1992 was presented to show he has a mental disorder. He points out that he has never been found with pornography depicting coercive sex and has made no statements reflecting an urge to engage in it. He also points out that his wife testified that the couple's sex life was normal.

But the state was not required to prove a recent overt act to establish that Johnson suffers from paraphilic coercive disorder. (§ 6600, subd. (d).) And the state's experts testified that Johnson *has* the disorder, not simply that he had it years ago. Dr. D'Orazio testified it is unlikely that people who suffer from paraphilic coercive disorder will act out in a prison environment, and the disorder can manifest again after a latent period.

8

Dr. Padilla testified that paraphilic coercive disorder is typically a chronic disorder that can be managed but not cured. He also testified that Johnson denied committing rape, and denial impedes effective management of the disorder.[8]

Furthermore, Drs. D'Orazio's and Padilla's diagnoses were based on factors other than Johnson's convictions. The experts considered (1) the collective number of Johnson's coercive sex acts; (2) the long pattern of his sexual violence, as evidenced by the length of time between the 1983 and 1992 offenses; (3) the rapidity with which Johnson reoffended after the first conviction; (4) his ability to sustain sexual arousal despite the distress and resistance of his victims; (5) his use of a higher level of force than necessary to gain compliance; (6) the availability of consensual sexual partners, indicating his preference for forcible sex; and (7) his advance planning of the assaults. The jury could have reasonably accepted the state's experts' testimony that these factors support a conclusion that Johnson suffers from a chronic disorder that renders him a continuing danger to others. (See *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1090 [even though defendant did not exhibit difficulty controlling behavior in custody, state's experts' explanation that paraphilic coercive disorder is chronic and generally does not abate without intervention was substantial evidence of defendant's inability to control behavior].)

Johnson argues that some of the factors relied upon by the state's experts were improperly applied to him.[9] According to him, the third factor—rapidity of reoffense—

---

[8] Johnson claims that he has now accepted full responsibility for his actions. The jury, however, had reason to be doubtful. Johnson testified that he said the following to Dr. D'Orazio about raping his third victim: "I didn't know how to have remorse for a crime I felt like I may have not committed." When asked if he still felt that way, Johnson testified that he had since decided that, even though he did not remember the incident, his third victim's account of the rape was correct. This testimony hardly reflects a rousing acceptance of responsibility. In any event, as a reviewing court we cannot second-guess the jury's credibility determinations. (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.)

[9] Johnson briefly argues that the factors relied upon by the state's experts have not "been validated by peer-reviewed studies." But Drs. D'Orazio and Padilla testified that the factors were based on their understanding of the disorder and were supported by

9

was not shown because, although his first two offenses occurred in close proximity, his third offense did not occur until eight years after the second offense. But he was incarcerated for several years during this period, and he presumably had limited opportunity to reoffend during it. He also argues that the fourth factor—an ability to sustain sexual arousal despite a victim's distress—was countered with evidence that he is able to sustain arousal with consenting sexual partners. Dr. Padilla, however, testified that people who have paraphilic coercive disorder can and do have consensual sex. In any event, the state's experts never testified that each and every identified factor must be present to diagnose paraphilic coercive disorder. Accordingly, even if we decided that a particular factor lacked evidentiary support, we would not necessarily be able to conclude that the jury's determination was unsupported.

Johnson also maintains that insufficient evidence was presented that he is likely to reoffend. According to him, the Static-99R, the actuarial instrument administered by the state's experts, shows that he has a low-to-moderate risk of recidivism. He asserts that the state's experts should have stopped there, but instead proceeded improperly to interpret his Static-99R results using additional, unvalidated instruments, including the Structured Risk Assessment, Forensic Version and Stable 2007, which he argues showed an inappropriately high risk of reoffense. He also argues that he committed the offenses due to unresolved anger issues and that there is no evidence that these same motivations drive him today.

These arguments are unconvincing. To begin with, Johnson had, and exercised, the opportunity to introduce contrary testimony from his own experts explaining the weaknesses in the state's theories. The jury heard evidence from Drs. Abbott and Heard that the Structured Risk Assessment, Forensic Version and the Stable 2007 were unreliable, but it apparently found that testimony unpersuasive. Johnson also exercised the opportunity to cross-examine the state's experts about the Static-99R and the other bases of their opinions. (See Evid. Code, § 721, subd. (a).)

literature in the field and, as we previously mentioned, Johnson did not contest their expert qualifications.

10

We recognize that all of the experts calculated Johnson's risk of reoffending to be less than 50 percent. But whether a person is likely to reoffend is not a strictly mathematical determination. (*People v. Superior Court* (*Ghilotti* ) (2002) 27 Cal.4th 888, 921.) Even though the SVPA's phrase " 'likely to engage in acts of sexual violence' . . . connotes much more than the mere possibility that the person will reoffend . . . [,] the statute does not require a precise determination that the chance of reoffense is better than even. Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community." (*Id.* at p. 922, italics omitted.)

The question for us is whether there was substantial evidence upon which the jury could have found that Johnson was likely to reoffend. We conclude there was. First, Johnson's history of sexual violence is, in and of itself, meaningful evidence of a potential likelihood of reoffending. (See *Hendricks*, *supra*, 521 U.S. at pp. 357-358 [" '[p]revious instances of violent behavior are an important indicator of future violent tendencies' "].) Second, the state's experts found that Johnson shares characteristics with a group of others who have a high risk of reoffense. Third, the record shows that the experts relied upon scientific assessment tools in making their diagnoses and in evaluating the risk of reoffense, and they explained the factors they considered to be relevant. It was up to the jury to decide what weight to give the expert opinions. (See *In re Scott* (2003) 29 Cal.4th 783, 823-824.)

Ultimately, Johnson merely asks us to reweigh the evidence, something that we as an appellate court cannot do. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The state's experts here testified at length about the bases of their diagnoses and relied on DSM diagnostic criteria and other actuarial tools designed to predict the risk of reoffense. And Johnson was able to cross-examine the state's witnesses and present his own expert testimony on these issues. "Any professional debate over the viability and reliability of [paraphilic coercive disorder] is subject to the adversarial process which, by vigorous

11

cross-examination, would 'expose the strengths and weaknesses of the professional medical opinions offered' in reaching a considered legal determination as to whether a respondent suffers a mental abnormality . . . ." (*State v. Shannon S*. (N.Y. 2012) 980 N.E.2d 510, 514; but see generally *State v. Donald DD.* (N.Y. 2014) 21 N.E.3d 239.) Although an expert's opinion cannot be based on guess, surmise, or conjecture, we cannot conclude on this record that the state's experts' opinions were so based. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1110; see also *People v. Stoll* (1989) 49 Cal.3d 1136, 1154 ["No precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior"].) We conclude that substantial evidence supports the jury's finding that Johnson is an SVP.

   2.  The jury was properly instructed on the state's burden of proof.

  Johnson argues that the trial court's instruction on the burden of proof violated his due process rights. Specifically, he challenges the use of CALCRIM No. 3454, which, as given, provided in relevant part: "The petition alleges that Lamar Johnson is an SVP. To prove this allegation, the People must prove beyond a reasonable doubt that [1] he has been convicted of committing sexually violent offenses against one or more victims[; 2] [h]e has a diagnosed mental disorder[;] and [3] as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior. [¶] . . . [¶] The likelihood that the person will engage in such conduct does not have to be greater than 50 percent."

  Johnson argues that the instruction's statement on the likelihood of reoffense confused the jury about the state's burden of proof. According to him, the statement suggested that the state's burden was less than a preponderance of the evidence when it was actually proof beyond a reasonable doubt. The Attorney General responds that Johnson forfeited the issue by failing to raise it below and that the instruction was proper in any event.

  We begin by rejecting the Attorney General's forfeiture argument. We recognize that a party's failure to request a clarifying instruction generally forfeits that claim on

appeal. (*People v. Young* (2005) 34 Cal.4th 1149, 1202-1203.) But, "[e]ven in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Mayfield* (1997) 14 Cal.4th 668, 773.) Moreover, a failure to object to an instruction does not result in a forfeiture when the alleged error affects the defendant's "substantial rights." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We conclude that there was no forfeiture here because a clear statement of the state's burden of proof was necessary for the jury's understanding of the case and because an instruction improperly reducing the state's burden of proof would impact Johnson's substantial rights.

Turning to the merits of the argument, we observe that the Sixth District Court of Appeal rejected an identical challenge to a similar instruction in *People v. Hubbart* (2001) 88 Cal.App.4th 1202. The court reasoned that the instruction "d[id] not state or imply that the phrase 'likely that he will engage in sexually violent criminal behavior' is the standard of proof for the ultimate SVPA determination." (*Id.* at p. 1233.) It also observed that the instructions "provide[d] a detailed definition of the phrase 'reasonable doubt,' thereby further emphasizing that reasonable doubt is the standard the jury must apply." (*Ibid.*) The court concluded that "any reasonable jury would be entirely capable of separating the criteria of finding it 'likely' that the person will engage in sexually violent criminal behavior from the standard of proof of 'beyond a reasonable doubt.' " (*Ibid.*)

Johnson contends that *People v. Hubbart*, *supra*, 88 Cal.App.4th 1202 was wrongly decided, arguing that a typical juror would not understand that the reasonable doubt standard is higher than a preponderance of the evidence. We disagree. "We must . . . assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) As the trial court instructed the jury on the meaning of proof beyond a reasonable doubt, we must assume that the jurors understood the difference between that standard and the standard applicable to the likelihood that Johnson would

13

reoffend. Considering the jury instructions as a whole and reading the challenged instruction in context, we conclude there is no "reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

3.  A jury instruction on the presumption of innocence was not required.

Johnson argues that the trial court improperly excluded references to the presumption of innocence and erred in refusing to instruct the jury that he was presumed not to be an SVP. Again, we disagree.

At trial, the state moved to exclude any reference to a presumption that Johnson is not an SVP. The trial court granted the motion, rejecting Johnson's argument that the SVPA and the California Constitution required an instruction that he is presumed not to be an SVP until proven otherwise.

The trial court's ruling was predicated on *People v. Beeson* (2002) 99 Cal.App.4th 1393 (*Beeson*), in which the defendant challenged his continued involuntary commitment as a mentally disordered offender (MDO) under the MDO Act, Penal Code section 2960 et sequitur. In *Beeson*, the court held that the federal and state Constitutions do not "require a presumption-of-innocence-like instruction" in MDO proceedings. (*Id.* at pp. 1409-1411.) The court reasoned that civil commitment proceedings do not implicate the constitutional rights afforded to criminal defendants and that "the risk of error is qualitatively different in the context of a civil commitment hearing" (*id.* at p. 1407) because the " 'layers of professional review and observation of the patient's condition . . . provide continuous opportunities for an erroneous commitment to be corrected.' " (*Id.* at p. 1410, quoting *Addington v. Texas* (1979) 441 U.S. 418, 428-429.) The court concluded that the Fourteenth Amendment merely requires the application of the clear-and-convincing standard at civil commitment hearings, and the state's decision to impose the higher, reasonable-doubt standard did not trigger a right to a presumption-of-innocence instruction. (*Beeson*, at p. 1409.)

Johnson argues that *Beeson, supra,* 99 Cal.App.4th 1393 is flawed and inapplicable in the SVPA context. He first contends that the SVPA's beyond-a-

reasonable-doubt standard is inextricably intertwined with the principle that a person is presumed not to be an SVP. We are not convinced. Even in criminal trials, the failure to give a requested instruction on the presumption of innocence does not necessarily violate the federal Constitution. (*Kentucky v. Whorton* (1979) 441 U.S. 786, 789.) Moreover, civil commitment proceedings are not criminal or punitive, and the constitutional principles applicable to criminal defendants do not necessarily apply. (See *Addington v. Texas*, *supra*, 441 U.S. at pp. 427-431 [beyond-a-reasonable-doubt standard not constitutionally required in civil commitment cases].)

Second, Johnson argues that the legislature intended the presumption-of-innocence instruction to apply in the SVPA context. He reasons that statutes should be interpreted by assuming that the legislature is aware of judicial determinations and points out that, prior to the SVPA's enactment, California courts held that former section 5352, an analogous provision of the Lanterman-Petris-Short Act, required an instruction that a proposed conservatee is presumed to not be gravely disabled until the state carries its burden of proof. (See *Conservatorship of Law* (1988) 202 Cal.App.3d 1336, 1340; *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1099.) We agree with the Attorney General that this is not an issue of statutory interpretation since the SVPA does not require any kind of jury instruction regarding presumptions about SVP status. Even if we considered it to be a matter of statutory interpretation, courts have reevaluated the application of criminal procedural safeguards to civil commitment proceedings since *Walker* and *Law* were decided over 25 years ago. (See *Beeson*, *supra*, 99 Cal.App.4th at pp. 1404-1405.) Moreover, the SVPA has been amended several times since *Beeson* was decided in 2002, and none of those amendments requires an instruction on presumption. (See, e.g., Stats. 2006, ch. 337, § 55; Stats. 2012, ch. 24, § 143.)

Third, Johnson contends that, unlike the MDO statute at issue in *Beeson, supra,* 99 Cal.App.4th 1393, the SVPA does not provide adequate opportunities to correct erroneous commitments. We disagree. Although an SVP's options for seeking release are restricted, they are sufficient to differentiate involuntary commitment under the SVPA from criminal incarceration. As discussed above, committed SVPs are entitled to

15

an examination of their current mental condition once per year. (§ 6604.9, subd. (a).) The DSH may forward a report and recommendation for conditional relief if it determines that the committed person is no longer likely to commit acts of sexual violence (§ 6607), and the committed person may petition for conditional release once per year. (§ 6608, subd. (j).) And at any hearing on conditional release, the committed person has the right to the assistance of counsel and the appointment of experts. (§ 6608, subds. (a) & (g).)

Accordingly, we hold that the trial court did not err by failing to instruct the jury that Johnson was presumed not to be an SVP until the state proved otherwise beyond a reasonable doubt.

> 4. Johnson's equal protection challenge is unavailing.

Johnson argues that the SVPA violates the equal protection clauses of the federal and state Constitutions because it treats SVPs less favorably than persons civilly committed under the MDO Act and persons civilly committed under Penal Code section 1026 after pleading not guilty by reason of insanity and being acquitted of criminal charges (NGIs). He focuses on two differences between the treatment of SVPs on the one hand and MDOs and NGIs on the other. We conclude that neither difference supports a facial equal protection challenge.

First, Johnson focuses on section 6608, subdivision (a), which allows committed SVPs to petition a trial court for discharge without the recommendation or concurrence of the DSH. Upon receipt of such a petition, the court must "endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).) Johnson argues that the provision violates his equal protection rights because courts cannot summarily deny the petitions of similarly situated MDOs and NGIs without a hearing.

The Attorney General argues that Johnson's challenge to section 6608 is not ripe because the record does not show that he has petitioned for release under the statute. "The ripeness requirement . . . prevents courts from issuing purely advisory opinions. It is rooted in the fundamental concept that the proper role of the judiciary does not extend

to the resolution of abstract differences of legal opinion . . . [and] is primarily bottomed on the recognition that judicial decision-making is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.)  The ripeness doctrine, however, should not prevent courts from adjudicating matters where:  (1) the dispute is concrete and appropriate for immediate resolution and (2) delayed resolution would present a hardship to the parties.  (*Id.* at pp. 170-173.)  We agree that Johnson's complaints are too abstract to warrant immediate resolution since Johnson has yet to petition for his release.  If he files such a petition, the DSH may support it and the trial court would then be required to hold a hearing.  But even if the DSH failed to support such a petition, the court could still set a hearing.  In either case, the challenged provision would not be triggered.

Rejecting Johnson's equal protection challenge as unripe does not preclude review in the future.  If Johnson petitions for release and the trial court summarily denies the petition as frivolous, he may appeal the dismissal on equal protection grounds.  (See *People v. Olsen* (2014) 229 Cal.App.4th 981, 994.)  Accordingly, we decline to reach the merits of his equal protection challenge to section 6608, subdivision (a) as the issue is not ripe.[10]

Johnson's second equal protection challenge concerns SVPs' indefinite terms of commitment and their burden of proof in seeking release.  To obtain conditional release from indefinite commitment, an SVP must petition the trial court.  (§ 6608, subd. (a).)  If the DSH does not agree that conditional release is appropriate, the SVP bears the burden of proving by a preponderance of the evidence that it is.  (§ 6608, subd. (k).)  In contrast,

---

[10] In *People v. McCloud*, *supra*, 213 Cal.App.4th 1076, our colleagues in Division Two concluded the same equal protection claim was not "wholly without merit" and remanded to the trial court for further factual findings.  (*Id.* at p. 1088.)  Whether the claim was ripe, however, was not addressed, and decisions are not authority for points they do not consider.  (*People v. Barragan* (2004) 32 Cal.4th 236, 243.)

17

the MDO statute only provides for a commitment of one year.  (Pen. Code, § 2970, subd. (b).)  If the state wishes to extend an MDO's term, a hearing must be held and the state must prove beyond a reasonable doubt that the person still qualifies as an MDO. (Pen. Code, § 2972.)  Similarly, the initial commitment term for an NGI is two years, and the term may be extended only if the state proves beyond a reasonable doubt that the NGI continues to meet the statutory criteria.  (Pen. Code, § 1026.5, subd. (b)(8).)  Johnson argues that the additional burdens imposed by the SVPA commitment scheme violate his equal protection rights.

This is not the first time this issue has been raised.  In *McKee I*, *supra*, 47 Cal.4th at pp. 1203, 1207, our state Supreme Court determined that, for purposes of the equal protection clause, SVPs are similarly situated to MDOs and NGIs.  The court then remanded the case to the trial court for an evidentiary hearing to determine whether there were legitimate reasons to subject SVPs, but not MDOs and NGIs, to indefinite commitments.  (*Id.* at p. 1208.)  On remand, and following a 21-day evidentiary hearing, the trial court concluded that the People had met their burden of justifying the disparate treatment.  (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1330, 1332 (*McKee II*).) The Fourth District Court of Appeal affirmed (*id.* at pp. 1348, 1350), and the Supreme Court denied McKee's petition for review on October 10, 2012, S204503.

Johnson argues at length that *McKee II*, *supra*, 207 Cal.App.4th 1325 was incorrectly decided.  But as explained by our colleagues in Division Three in *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864 (*McKnight*), the Supreme Court "transferred . . . multiple 'grant and hold' cases under *McKee I* . . . to the Courts of Appeal with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final . . . .  On remand, *McKee* [*II*] concluded that differences between SVP's as a class and other offenders justify their different treatment under the Act.  It is plain that *McKee II* is not to be restricted to [defendant] alone . . . , but rather its holding applies to the class of SVP's as a whole."  (*Ibid.*, italics omitted.)  The Supreme Court denied review in *McKnight* on March 13, 2013, S208182,

and it has since denied review in other cases that also found *McKee II* dispositive on the equal protection issue.[11]

We agree with the Fourth District's equal protection analysis in *McKee II*, *supra*, 207 Cal.App.4th at pp. 1339-1347, and we thus conclude that Johnson's indeterminate commitment under the SVPA does not violate his rights to equal protection.

        5.     Johnson's ex post facto and double jeopardy challenges are barred by our state Supreme Court precedent.

Johnson asserts that the SVPA is punitive in intent and effect and thus runs afoul of the ex post facto and double jeopardy clauses of the United States Constitution. Johnson concedes that our state Supreme Court rejected this same argument in *McKee I*, *supra*, 47 Cal.4th at pp. 1193-1195, but he states that he wishes to preserve the arguments in the event he seeks federal habeas relief. Given controlling Supreme Court precedent, his claim fails. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

B.     *Johnson's Habeas Petitions.*

Having rejected the arguments Johnson raises in his appeal, we turn to his petitions for habeas corpus. In the first, he contends that the state's case is completely undermined by two pieces of newly discovered evidence—specifically, the fifth edition of the DSM, which was published in May 2013, and the declaration of Allen Frances, M.D., which was submitted with the petition. In the second, he claims that the revisions to the DSM undermine the state's experts' testimony and render it "false evidence" under Penal Code section 1473 (section 1473). Essentially, both petitions ask us to conclude, in the context of a case in which competing expert testimony on the subject was presented without objection, that paraphilic coercive disorder can no longer be considered a valid mental disorder. We decline to do so.

---

[11] *People v. Gray* (2014) 229 Cal.App.4th 285, 291-292, petition for review denied November 12, 2014, S221708; *People v. Kisling* (2014) 223 Cal.App.4th 544, 547-548, petition for review denied April 23, 2014, S216859; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378, petition for review denied July 10, 2013, S210417; *People v. Landau* (2013) 214 Cal.App.4th 1, 48, petition for review denied May 22, 2013, S209450; *People v. McCloud*, *supra*, 213 Cal.App.4th at p. 1079, petition for review denied May 22, 2013, S208845.

We begin by observing that, in general, a person involuntarily committed under the SVPA may challenge the confinement through a petition for writ of habeas corpus. (§ 7250; *People v. Allen* (2008) 44 Cal.4th 843, 859; *People v. Talhelm* (2000) 85 Cal.App.4th 400, 405.) The restrictions on bringing the writ are typically discussed in the context of challenges to criminal imprisonment, but they apply equally to challenges to civil commitments. Important among these restrictions is that the writ does not lie "to retry issues of fact or the merits of a defense, . . . and the sufficiency of the evidence to warrant the [jury's determination] is not a proper issue for consideration." (*Ex parte Lindley* (1947) 29 Cal.2d 709, 723.) And when a habeas petition is based on a claim of newly discovered evidence, "[i]t is not sufficient that the evidence might have weakened the prosecution's case or presented a more difficult question for the judge or jury." (*In re Clark* (1993) 5 Cal.4th 750, 766.) Rather, newly discovered evidence justifies habeas relief only when it completely undermines the entire structure of the state's case. (*In re Hall* (1981) 30 Cal.3d 408, 421-423.)

A habeas petition may also be based on a claim that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person[.]" (Pen. Code, § 1473, subd. (b)(1).) The legislature recently amended section 1473 to expand the definition of false evidence to "include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (Pen. Code, § 1473, subd. (e)(1); Stats. 2104, ch. 623, § 1.) Thus, both of Johnson's petitions ultimately turn on whether the new version of the DSM undermines the validity of a diagnosis of paraphilic coercive disorder.

Being an extraordinary remedy, the writ is not available when an alternative remedy is. (*In re Clark*, *supra*, 5 Cal.4th at p. 764, fn. 3.) Seizing on this principle, the Attorney General argues that Johnson's petitions must be denied because Johnson could argue in a section 6608 proceeding that the fifth edition of the DSM requires his release. We are not persuaded. A section 6608 proceeding does not provide Johnson with an adequate remedy because of the nature of both his claims, which involve whether the

20

fifth edition renders invalid the diagnosis upon which his commitment under the SVPA is premised. If this were found to be true, the alternative remedy of a conditional release under section 6608 would be inadequate because it would require him to continue supervision under a "forensic conditional release program" for at least a year, and it would require him to petition for an unconditional release. (§ 6608, subds. (g) & (m).) If Johnson truly never had a mental disorder qualifying him as an SVP, he would not properly be subject to these restraints (even though he still would properly be required to fulfill any remaining parole obligations).[12] Accordingly, section 6608 does not provide Johnson with an adequate alternative remedy.

We now turn to the merits of Johnson's petitions. According to Johnson, the drafters of the fifth edition of the DSM rejected a proposal from certain groups to clarify the fourth edition's language by including a specific diagnosis for paraphilic coercive disorder. He points out that the drafters also removed the passage in the fourth edition concerning nonconsenting persons and did not mention paraphilic coercive disorder when discussing conditions needing further research before being identified as official diagnoses.[13] Johnson contends that the upshot of these changes is that paraphilic coercive disorder can no longer be considered a valid mental disorder under the SVPA. Although we accept that the fifth edition may cast additional doubt on the validity of paraphilic coercive disorder, we cannot agree that it completely undermines the state's case or renders the state's experts' testimony false evidence.

The federal constitution does not require an SVP's commitment to be based on a disorder that is uniformly recognized by the mental health community. In *Hendricks*,

---

[12] Section 6608 might provide an adequate remedy in some situations, such as where newly discovered evidence establishes that the SVP is no longer likely to reoffend. If accepted, such evidence would only justify a conditional release, and the section 6608 remedy therefore would be adequate.

[13] The fifth edition of the DSM still references a residual category of paraphilias, noting that "[m]any dozens of distinct paraphilias have been identified and named, and almost any of them could, by virtue of its negative consequences for the individual and for others, rise to the level of a paraphilic disorder."

21

*supra*, 521 U.S. 346, the United States Supreme Court rejected the argument that Kansas's SVP Act violated due process because it allowed commitment based on a " 'mental abnormality[,]' . . . a term coined by the Kansas Legislature, rather than by the psychiatric community." (*Id.* at pp. 357, 359.) The court observed, "[W]e have never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes. . . . As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community," which the court concluded was permissible. (*Id.* at p. 359.)

The Supreme Court later reaffirmed this principle in *Crane*, *supra*, 534 U.S. 407, another case involving Kansas's SVP Act. The court rejected the argument that the statute required the state to prove an offender had a total or complete lack of control over his or her dangerous behavior. (*Id.* at pp. 412-413.) It also concluded that an offender could not be committed without any lack-of-control determination. (*Id.* at p. 413.) Although an alternative standard might be more precise, "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules." (*Ibid.*) The court reasoned that "the States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment" and that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." (*Ibid.*)

Following *Hendricks* and *Crane*, the Seventh Circuit Court of Appeals discussed the definitiveness of the DSM in particular in *McGee v. Bartow* (7th Cir. 2010) 593 F.3d 556. The petitioner in *McGee* challenged his involuntary civil commitment under an SVP statute, arguing that paraphilic coercive disorder was an invalid disorder because it was not specifically listed in the fourth edition of the DSM. (*McGee,* at p. 574.) The court ruled, "[W]e cannot adopt any rule that asks the DSM to do what the text itself professes that it was not intended to do: answer ultimate legal questions or create a perfect fit between law and medicine in the realm of involuntary civil commitment." (*Id.*

22

at p. 576.)  The court observed that regardless whether a diagnosis is accepted by the DSM, "the factfinder has the ultimate responsibility to assess how probative a particular diagnosis is on the *legal* question of the existence of a 'mental disorder'; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination." (*Id.* at p. 577, italics in original.)  The existence of a professional debate over paraphilic coercive disorder does not mean that the diagnosis is " 'too imprecise a category' " such that it runs afoul of due process.  (*Id.* at p. 570, quoting *Hendricks, supra,* 521 U.S. at p. 373 (conc. opn. of Kennedy, J.).)  *McGee* concluded that "a finding of a 'mental disorder' does not violate due process even though the predicate diagnosis is not found within the four corners of the DSM." (*McGee*, at p. 576.)

We agree with these observations and conclusions and consider them to be equally applicable to the DSM's fifth edition.  Even if the fifth edition reflects a growing skepticism in the psychiatric community about paraphilic coercive disorder, we cannot conclude that a commitment based on that disorder violates due process, thereby completely undermining the state's case against Johnson.  Similarly, we also cannot conclude that the fifth edition reflects scientific research that undermines expert testimony diagnosing that disorder and renders that testimony false evidence.[14]

Our holding might be different if the SVPA required an SVP's mental disorder to be specifically mentioned in the DSM.  But it does not.  The SVPA does not refer to the DSM, much less require an SVP's mental disorder be listed in it.  (See § 6600, subd. (a)(1) [an SVP is someone with a "diagnosed mental disorder that makes the person a danger to the health and safety of others"].)  Even the Court of Appeals of New York, one of the courts most wary of basing an involuntary civil commitment on a diagnosis of paraphilic coercive disorder, accepts that under its state's civil-commitment statute "a mental abnormality 'need not necessarily be one so identified in the DSM' " since the

---

[14] Courts in other states have continued to recognize paraphilic coercive disorder as a valid diagnosis despite the publication of the fifth edition of the DSM.  (See, e.g., *In re Detention of Melcher* (Ill.Ct.App. 2013) 2 N.E.3d 1181, 1193-1195; *In re Cozart* (Mo.Ct.App. 2014) 433 S.W.3d 483, 490.)

statute "does not reference or require that a diagnosis be limited to mental disorders enumerated within the DSM." (*State v. Shannon S.*, *supra*, 980 N.E.2d at pp. 513-514.)

As for Dr. Frances's declaration, it cannot even be considered newly discovered evidence or "later scientific research." (Pen. Code, § 1473, subd. (e)(1).) Dr. Frances is a professor emeritus of psychiatry at Duke University and was the chair of the Task Force that formulated the original fourth edition of the DSM. In his declaration, he states that the American Psychiatric Association has, over the past 24 years, consistently rejected the notions that the compulsion to rape could be conceived of as a mental illness and that the diagnosis of paraphilic coercive disorder should be used in forensic proceedings. He also opines, "It is obvious that Mr. Johnson is no more than a common criminal whose sexual violence was not due to a mental disorder and that he does not qualify for any diagnosis of Paraphilia." But other than its passing references to the fifth edition of the DSM, the declaration simply elaborates upon the testimony of Johnson's experts below, who also questioned the legitimacy of a diagnosis of paraphilic coercive disorder. The declaration does not support Johnson's claims based on newly discovered evidence and false evidence.

We think it worth reiterating that the validity of paraphilic coercive disorder was fully litigated at Johnson's trial. Johnson did not object to the introduction of the state's experts' testimony on the subject, and he was able to cross-examine those experts and

24

present the testimony of his own experts.[15] (See *Brown v. Watters* (7th Cir. 2010) 599 F.3d 602, 612 [conclusion that diagnosis of paraphilic coercive disorder is acceptable is "strengthened where, as here, able assistance of counsel *actually did expose* the professional debate to the jury and substantial contrary professional opinions were offered"], italics in original.)  Although the fifth edition of the DSM and Dr. Frances's testimony might have bolstered Johnson's arguments if introduced at trial, they do not completely undermine the state's case or render the state's experts' testimony false evidence.  Regardless of the publication of the DSM's fifth edition, the record before us includes substantial evidence that paraphilic coercive disorder is a legitimate diagnosis and that Johnson suffers from it.

III.
DISPOSITION

The judgment is affirmed, and the petitions for a writ of habeas corpus are denied.

---

[15] Because the testimony about paraphilic coercive disorder was introduced without objection, we need not decide how questions about the admissibility of expert testimony on that disorder should be handled by a trial court.  Suffice it to say that the admissibility of expert testimony in California is typically evaluated under Evidence Code section 801, which requires the testimony to be related "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and to be "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject."  In California, the admissibility of expert testimony about the diagnosis of mental conditions, including those not referenced in the DSM, is not governed by the *Kelly/Frye* test, which arose from *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 and was adopted for use in California courts in *People v. Kelly* (1976) 17 Cal.3d 24.  (*People v. McDonald* (1984) 37 Cal.3d 351, 373; *People v. Ward* (1999) 71 Cal.App.4th 368, 373.)  The *Kelly/Frye* test requires a party seeking to introduce expert testimony relying on "a new scientific technique" to show "general acceptance of the new technique in the relevant scientific community" and the witness's qualification as an expert and use of "the correct scientific procedures" in employing the technique.  (*Kelly*, at p. 30.)

25

_____

Humes, P.J.

We concur:

_____

Margulies, J.

_____

Dondero, J.

Trial Court:                    San Mateo County Superior Court

Trial Judge:                 Honorable Robert Atack

Counsel for Appellant:     Michele Kemmerling, under appointment by the First District Appellate Project

Counsel for Respondent:    Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Lawrence K. Sullivan, Supervising Deputy Attorney General, Bridget Billeter, Deputy Attorney General