Filed 7/22/15
See Dissenting Opinion

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059589 |
| v. | (Super.Ct.No. FELSS1300597) |
| FRANCIS JOHN LaBLANC, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Steve Malone, Judge. Reversed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Joy Utomi and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Francis John LaBlanc is currently committed for an indeterminate term of treatment as a sexually violent predator (SVP). In this appeal, LaBlanc challenges the trial court's order pursuant to Welfare and Institutions Code[1] section 6608, subdivision (a), denying, as frivolous, his petition for unconditional discharge. We conclude the trial court abused its discretion. Therefore, we reverse the order and remand for the trial court to conduct an evidentiary hearing on the petition. We deny defendant's request that on remand the hearing be assigned to a different judge, pursuant to Code of Civil Procedure section 170.1, subdivision (c).

## I.

## FACTS AND PROCEDURAL BACKGROUND[2]

In 1965, defendant was convicted in Colorado of two counts of rape. (*LaBlanc v. People* (Col. 1966) 418 P.2d 888, 889, cert. den. (1967) 388 U.S. 922.) Defendant was discharged from a Colorado prison in March 1985. Later that year, the San Bernardino County District Attorney's Office filed a felony complaint alleging defendant committed

---

[1] Unless otherwise indicated, all undesignated statutory references are to the Welfare and Institutions Code.

[2] We take some background facts from our prior opinions relating to defendant's commitment as an SVP. (*People v. Superior Court* (*LaBlanc*) (Oct. 25, 2001, E028182) [nonpub. opn.] [ordering the superior court to set aside a summary judgment dismissing the initial petition to commit defendant as an SVP]; *People v. LaBlanc* (Oct. 17, 2008, E043166) [nonpub. opn.] [rejecting defendant's various constitutional challenges to the Sexually Violent Predator Act (SVPA)].)

2

two counts of forcible rape (Pen. Code, former § 261, subd. 2), and one count of robbery of an inhabited dwelling (Pen. Code, § 459). Two years later, defendant pleaded guilty to the California rape and robbery charges, admitted to suffering the two Colorado rape convictions, and was sentenced to 20 years in state prison.

Defendant was scheduled to be paroled on May 15, 1996, but, based on an evaluation by the California Department of Mental Health[3] (Department) that defendant met the criteria for an SVP, the People filed a petition to civilly commit him for treatment under the SVPA. A jury found beyond a reasonable doubt that defendant was an SVP, and he has been committed for treatment ever since.

On January 23, 2013, defendant filed a petition in the superior court seeking an order pursuant to section 6608 for his unconditional discharge from Coalinga State Hospital and from the jurisdiction of the Department. Defendant supported his petition with a report prepared by Mary Jane Alumbaugh, Ph.D., a clinical psychologist, and requested that the court make a preliminary determination that the petition was not frivolous and to set an evidentiary hearing on his request for an unconditional discharge.

At the request of defendant's appointed counsel, Alumbaugh interviewed defendant on seven occasions and reviewed various records and reports to determine whether he was still an SVP as defined in section 6600, subdivision (a)(1), or whether,

---

[3] The Department of Mental Health is now known as the Department of State Hospitals, and the Director of Mental Health is now known as the Director of State Hospitals. (*People v. Superior Court* (*Karsai*) (2013) 213 Cal.App.4th 774, 778, fn. 1.)

3

instead, he satisfied the criteria for unconditional release. Alumbaugh found the first SVP criteria to be present because defendant had been convicted of a sexually violent offense, as defined in section 6600, subdivision (b), against one or more victims. Defendant's criminal records from Colorado and California demonstrated that defendant had been convicted of forcible rape in both states against a total of four victims. With respect to the second SVP criteria, Alumbaugh concluded defendant did not have a diagnosed mental disorder that rendered him a danger to the safety and health of others because, if released, he would not likely engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) Therefore, Alumbaugh concluded defendant was eligible for unconditional release.

During interviews, defendant told Alumbaugh that he lost interest in sex after receiving radiation therapy for prostate cancer, which left him impotent. Defendant also told Alumbaugh that he had difficulty getting an erection, and that doctors told defendant Viagra would not help his type of impotence. In addition to prostate cancer, Alumbaugh reported that defendant also suffered from heart disease, that he was provisionally diagnosed with multiple sclerosis, and that he had one testicle surgically removed. A staff psychiatrist characterized defendant's health issues as "serious and significant." The psychiatrist also told Alumbaugh that, although defendant was occasionally irritated with staff and his peers, on the whole defendant was pleasant and "poses no more risk than any other seventy year old."

4

With respect to defendant's psychological diagnoses, Alumbaugh reported that when defendant was arrested in 1964 for the Colorado rapes, he was assessed before trial and one doctor diagnosed him with a character disorder that was severe in nature but did not constitute mental illness. Another Colorado doctor concluded defendant did not suffer from mental illness and diagnosed him with antisocial personality disorder. According to Alumbaugh, annual reports prepared by staff at Coalinga State Hospital for the years 2008, 2009, 2010, 2011, and 2012 diagnosed defendant with "Paraphilia NOS (non-consenting victim)," but the reports merely quoted from older SVP evaluations and repeated the earlier conclusion that defendant was dangerous. Alumbaugh noted that defendant steadfastly refused to attend group sex offender programs or to receive mental health treatment while in the hospital because the treatment he received would be used against him, and he did not take psychotropic medications on a regular basis. However, if released, defendant told Alumbaugh that he planned on relocating to Pennsylvania to live with his girlfriend and that he would attend a sex offender treatment program there.

Alumbaugh questioned a number of statements and conclusions found in defendant's prior reports:

First, a report prepared in 2009 asserted defendant sexually abused his half-sisters. Although the claims were never adjudicated and the report included "no substantiation or source for the information," Alumbaugh stated the claims were "given credence and accepted as facts." When defendant's attorney contacted hospital administrators about the claims, the attorney was told the charges "were mistakenly included." However, the

5

unsubstantiated claims were repeated in a 2011 report and formed the basis of one evaluator's conclusion that defendant "ha[d] the dynamic factor [of] identification with children . . . ."

Second, a 2003 report described defendant "as a highly psychopathic individual," a characterization that was repeated in reports prepared in 2008 through 2012. According to Alumbaugh, the reports failed to make note of defendant's advancing age and a score of less than 30 on the revised Hare Psychopathy Checklist—Revised (PCL-R).[4] These omissions undermined the conclusion that defendant was highly psychopathic because, according to the PCL-R manual and relevant literature, the PCL-R score loses significance in predicting future dangerousness of older men such as defendant.

Third, defendant's reports for 2009, 2010, and 2011 concluded defendant's health had no impact on his likelihood of reoffending because he suffered "'no chronic, life-threatening medical concerns,'" yet Alumbaugh stated those reports made no mention of defendant's history of prostate cancer and heart disease.

Fourth, all of the reports Alumbaugh reviewed repeated the charge that defendant tried to escape from county jail in 1986. The reports showed defendant was charged with attempted escape, but the charges were dismissed, yet the reports appeared to conflate events because they stated the attempt occurred in 1999. The reports also stated, with

---

[4] The PCL-R is a diagnostic tool for rating a person's psychopathic or antisocial tendencies. (*United States v. Campbell* (D. Neb. 2010) 738 F.Supp.2d 960, 967, fn. 14.)

6

certainty, that defendant tried to escape from Atascadero State Hospital. However, although defendant was charged with attempted escape, defendant's parole was violated for possession of contraband, and he was never convicted of attempted escape.

And finally, a 2012 report stated defendant was involved in three incidents at Coalinga State Hospital that were "severe" in nature. Yet, according to Alumbaugh, two of the incidents merely related to defendant's possession of contraband electronic parts and other material he used for his hobby of electronics repair. The third incident—in which defendant was alleged to have stalked a staff member—resulted in defendant suing that staff member for elder abuse because he felt the staff member was targeting him. Defendant then requested that other staff members deal with him. The evaluator opined the alleged stalking was evidence of defendant's hostility toward women. The same report concluded that, because defendant's two marriages ended because of his arrests for sex crimes, defendant was incapable of living with intimate partners for two continuous years without encountering significant conflict. According to Alumbaugh, the conclusion was incorrect because defendant's first marriage lasted four years and his wife supported him during his trial. Finally, from the fact defendant's mother died at age 85, the report inferred that defendant (who was 70 at the time) had "less than 15 years left at risk." Nonetheless, the report opined that defendant's age and age-related illnesses did not decrease the risk of defendant reoffending. Alumbaugh questioned the assumption that defendant would live to age 85 as "optimistic," and stated "the notion of an 85 year old rapist does strain credulity."

7

In a summary of her conclusions, Alumbaugh opined the reports from 2008 to 2012 were flawed because they merely repeated earlier evaluations of defendant that were 10 years old and did not consider current literature. She found it surprising that the reports attributed to defendant's crimes that were never formally charged or adjudicated and misrepresented defendant's alleged escape attempts. Alumbaugh also criticized the reports for making confident statements about defendant's health and life expectancy while ignoring defendant's serious medical issues and his advanced age. And most surprising to Alumbaugh was "the continual repetition of past descriptions and actions with no acknowledgment of changes across the years or even acknowledgement of the passage of time."

During a mental status examination conducted by Alumbaugh, defendant said his brain is sometimes "'foggy,'" but he denied having "disturbed thought content such as paranoia, obsessions, phobias, ideas of reference, thought broadcasting, insertion, or withdrawal." Defendant also denied suffering from auditory or visual hallucinations. Defendant admitted he was solely to blame for his predicament based on his bad choices. When specifically asked why he raped women, defendant told Alumbaugh, "'I have figured out why I did that,'" but then declined to elaborate on his motivation. Defendant told Alumbaugh the rapes had nothing to do with sexual abuse or anger against women. He also denied raping more than two women in Colorado, and denied his sisters' allegations of sexual abuse. Defendant told Alumbaugh that he is not an impulsive person, and that he "is much calmer and in control at this time in his life."

When discussing differential diagnosis, Alumbaugh addressed the diagnosis of "Paraphilia, Not Otherwise Specified," or "arousal to sex with non-consenting partners."[5] Alumbaugh reported the disorder is relatively rare and, according to articles she cited, is misused and controversial. According to Alumbaugh, the category of "Not Otherwise Specified" (NOS) found in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) is "for miscellaneous diagnoses that do not fit any specific diagnostic category," and is essentially "a residual category." One scholarly article cited by Alumbaugh stated that paraphilic coercive disorder was not intended to be included as a diagnosis in the fourth edition of the DSM, and it was only meant to cover very specific paraphilias such as necrophilia and coprophilia. Alumbaugh discussed a number of other scholarly articles, which called into question the validity of paraphilic coercive disorder as a proper diagnosis for most rapists.

Alumbaugh also addressed defendant's prior diagnosis with antisocial personal disorder. She expressed some skepticism of this diagnosis because it appeared to be based solely on defendant's bad grades, truancy, cigarette smoking, and association with juvenile delinquents. According to Alumbaugh, later evaluators tied this diagnosis to the unsubstantiated allegations that defendant molested his younger sisters. Alumbaugh

---

[5] Alumbaugh used the label "Paraphilia NOS" to describe defendant's diagnosis. Because the "Not Otherwise Specified" portion of that label is vague, we follow *People v. Johnson* (2015) 235 Cal.App.4th 80, 85, as modified April 7, 2015 [2015 Cal.App.Lexis 296] (*Johnson*), review den. July 8, 2015, S225960, and use the more descriptive term "paraphilic coercive disorder."

opined that, even if defendant had molested his sisters, the diagnosis of antisocial personality disorder would be invalid because "there is no research to support [the conclusion] that an Antisocial Personality Disorder is associated with or predicts sexually violent behavior." Although she could not make a conclusive diagnosis, out of an abundance of caution, Alumbaugh diagnosed defendant with antisocial disorder.

Alumbaugh opined that defendant is not likely to engage in sexually violent behavior in the future. According to Alumbaugh, risk assessment of sex offenders is determined by using actuarial tables that focus on the offender's sexual deviance, general criminality, and dynamic or changeable factors associated with reoffense. However, Alumbaugh opined that currently available actuarial tables have limited value. Alumbaugh scored defendant as a four on the "Static-99R,"[6] which gave him an 8.7 percent recidivist rate over five years. However, Alumbaugh reported that the average age of the subject population on which the Static-99R was developed was well below 50 years old, and she cited other actuarial tools that give even lower recidivist rates

---

[6] The Static-99 is a sex offender risk assessment tool that must be used to evaluate adult males who are required to register as sex offenders (Pen. Code, § 290.04, subd. (b)(1)), and it is commonly used in SVPA evaluations. (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 504, fn. 5.) "The Static-99R is a revised version of the Static-99 that takes into account the age of a sexual offender based on statistics showing the risk of sexual reoffense decreases as the offender ages." (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1341, fn. 4; see Hanson et al., *The Field Validity of Static-99/R Sex Offender Risk Assessment Tool in California* (2014) 1 J. Threat Assessment & Mgmt. 102, 103, available at <http://www.cce.csus.edu/portal/admin/handouts/Hanson%20et %20al%20(2014)%20California%20Static-99.pdf> [as of July 23, 2015].)

for men 60 and older. Based on research showing reduced recidivism rates in older men, and defendant's physical health, Alumbaugh opined that defendant's recidivist rate was "so low it is almost nonexistent."

The prosecution did not file a written opposition to defendant's petition. At the hearing, defendant's attorney argued the changes in actuarial research outlined in Alumbaugh's report made a sufficient threshold showing to avoid dismissal for frivolousness. The prosecutor argued that for defendant to obtain a full hearing, the trial court was required to find that the petition was not frivolous, and that defendant made a showing of changed circumstances. According to the prosecutor, Alumbaugh's report alleged no facts to demonstrate changed circumstances. For instance, the prosecutor pointed to the fact that defendant refused to participate in sex offender treatment as evidence that his circumstances had not changed. In response, defendant's attorney argued that a showing of changed circumstances was not always necessary, and that the proper test was whether going forward with an evidentiary hearing would be a frivolous waste of time. In any event, counsel argued Alumbaugh's report did demonstrate changed circumstances based on defendant's age and the research calling into question the actuarial tables previously used to determine defendant's risk of reoffending.

In its oral ruling, the trial court acknowledged that defendant was 70 years old and that he was a prostate cancer survivor. The court then addressed Alumbaugh's opinion that paraphilic coercive disorder is not a valid diagnosis for sexually violent predators. "The Court's response at that is that the jury did find beyond a reasonable doubt having

11

heard experts on both sides of this issue, proof beyond a reasonable doubt that the defendant did, in fact, have a diagnosed mental disorder that made him a danger to the health and safety of others and that it was likely that he would engage in serious violent criminal behavior." Based on the severity of defendant's multiple rapes over two decades, the fact that defendant did not seek treatment while committed, and that defendant reportedly had intense negative feelings against women, the court concluded defendant remained a danger to the community. Therefore, the court concluded that "to proceed farther with the petition would be frivolous and without merit," and denied the petition. Defendant appealed.

II.

DISCUSSION

A. *The Trial Court Abused Its Discretion by Denying As Frivolous Defendant's Petition for Unconditional Release; on Remand, the Court Shall Conduct an Evidentiary Hearing on Defendant's Request*

1. Applicable Law and Standard of Review

The SVPA provides for the civil commitment for an indefinite period of persons who are found beyond a reasonable doubt to be an SVP because they have been convicted of a sexually violent offense against one or more victims and they have been diagnosed with a mental disorder that renders them a danger to public health and safety because they are likely to reoffend and commit additional sexually violent acts. (§§ 6600, subd. (a)(1), 6603, subd. (d), 6604.) The SVPA is "'designed to ensure that the

12

committed person does not "remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness."'" (*People v. Cheek* (2001) 25 Cal.4th 894, 898, quoting *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1177 (*Hubbart*).) Among other rights afforded to an SVP at the time defendant filed his petition, section 6608 provided that an SVP could petition for conditional release *or* unconditional discharge without the recommendation or concurrence of the director of the Department.[7] (Former § 6608, subd. (a); Stats. 2012, ch. 24, § 146.)

"Upon receipt of . . . a petition [for unconditional discharge] without the concurrence of the director, the court 'shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds, and, if so, shall deny the petition without a hearing.' ([Former] § 6608, subd. (a).) If the petition is not found to be frivolous, the court shall hold a hearing to determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder.

---

[7] Section 6608 was amended in 2013 to allow a committed person to petition in the first instance only for conditional release if the Department does not authorize the petition. (§ 6608, subd. (a), as amended by Stats. 2013, ch. 182, § 3.) After at least one year on conditional release, the committed person may then petition for unconditional discharge. (§ 6608, former subd. (k), Stats. 2013, ch. 182, § 3, now subd. (m), as amended by Stats. 2014, ch. 877, § 1.) Unconditional discharge is still available in the first instance with the recommendation of the Director of State Hospitals. (§§ 6604.9, subds. (b), (d), 6605, subd. (a)(1).) The People do not contend that defendant's petition should be analyzed under the current version of section 6608, or that he may no longer request unconditional discharge without the concurrence or recommendation of the director.

13

([Former] § 6608, subd. (d).)  At the hearing, the person petitioning for release has the burden of proof by a preponderance of the evidence.  (§ 6608, subd. (i); [citation].)  The court is required to hold a hearing only if the petition is not based on frivolous grounds. [Citation.]" (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1406-1407 (*Reynolds*) [Fourth Dist., Div. Two].)

"The apparent rationale for the court's threshold determination of frivolousness is 'to deter multiple unsubstantiated requests and to reduce the administrative burden that might otherwise occur . . . .'" (*People v. Olsen* (2014) 229 Cal.App.4th 981, 993 (*Olsen*), quoting *Hubbart*, *supra*, 19 Cal.4th at p. 1148, fn. 14.)  However, the SVPA does not include a definition of "frivolous" for purposes of section 6608, subdivision (a).  (*Olsen*, at p. 993.)  In *People v. Collins* (2003) 110 Cal.App.4th 340, 346 (*Collins*), the appellate court adopted the definition of "frivolous" from the Code of Civil Procedure.  "[W]e see no reason why the Legislature's definition of the term used in the Code of Civil Procedure should not apply to SVPA civil proceedings.  Code of Civil Procedure section 128.5, subdivision (b)(2) defines 'frivolous' to mean '(A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party.'  Whether action taken by a party or party's attorney is frivolous under that statute '"is governed by an objective standard:  Any reasonable attorney would agree it is totally and completely without merit."'  [Citation.]" (*Collins*, at p. 349, fn. omitted; accord, *Reynolds*, *supra*, 181 Cal.App.4th at p. 1411.)

14

The California Supreme Court adopted essentially the same definition of frivolousness for section 6608, subdivision (a), relying on the test for frivolous appeals. "A frivolous petition is one that 'indisputably has no merit.'" (*People v. McKee* (2010) 47 Cal.4th 1172, 1192 , quoting *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650; see *Collins*, *supra*, 110 Cal.App.4th at p. 348 [definition of "frivolous" under the Code of Civil Procedure "is essentially the standard used by the *Flaherty* court"].) Under that standard, a petition is not frivolous if it makes a colorable showing of entitlement to relief. (Cf. *Flaherty*, at p. 648; *People v. Bryant* (2014) 60 Cal.4th 335, 363.)

In *Reynolds*, this court interpreted former section 6608 to require an SVP seeking unconditional discharge "to allege facts in his petition that will show he is not likely to engage in sexually violent criminal behavior due to his diagnosed mental disorder without supervision and treatment in the community . . . ." (*Reynolds*, *supra*, 181

Cal.App.4th at p. 1407.)[8] We also held that, on appeal, our task was to "review the facial adequacy of the petition" and determine whether the trial court's decision constituted an abuse of discretion. (*Id*. at p. 1407-1408.) We must "review the record to determine if, considering all the circumstances before it, the trial court exceeded the bounds of reason. Where there is a basis for the trial court's ruling and it is supported by the evidence, we will not substitute our opinion for that of the trial court. [Citation.]" (*Id*. at p. 1408.) Conversely, "[t]he trial court has abused its discretion if appellate review shows that the petition is not based upon frivolous grounds. [Citations.]" (*Olsen*, *supra*, 229 Cal.App.4th at p. 994.)

---

[8] At oral argument, we asked the parties to address whether a trial court reviewing a petition under section 6608 may make a determination of credibility. We conclude that, when conducting its threshold review for frivolousness, the trial court may make a limited determination of credibility and summarily deny the petition if, on the face of the petition and/or supporting evidence and any reports filed in opposition, the court determines the petition is so unworthy of belief that no reasonable trier of fact would credit it. In such a case, conducting the hearing would needlessly impose on the trial court the administrative burden the frivolousness review is meant to avoid. (*Olsen*, *supra*, 229 Cal.App.4th at p. 993.)

However, if the petition and supporting evidence passes such a minimum showing of credibility and otherwise makes a colorable showing of entitlement to relief, the trial court may inquire no further into the credibility of the defendant's proposed witnesses. Further determination of credibility must be reserved for the evidentiary hearing contemplated by section 6608, subdivision (g) (former § 6608, subd. (d)). (Cf. *Olsen*, *supra*, 229 Cal.App.4th at pp. 998-999 [during initial review for frivolousness, trial court may not inquire into factual question of whether defendant qualifies for release].) If the trial court denies the petition after conducting a full evidentiary hearing, the standard of review on appeal is for substantial evidence (*Reynolds*, *supra*, 181 Cal.App.4th at p. 1407, citing *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1503 (*Rasmuson*)), and the reviewing court will resolve questions of credibility in favor of the verdict. (*Rasmuson*, at p. 1507.)

2. Analysis

a. <u>Validity of Paraphilic Coercive Disorder As a Diagnosis</u>

In its oral ruling, the trial court acknowledged that Alumbaugh's report cited "numerous experts to opine that [paraphilic coercive disorder is] not a valid or legitimate mental disorder for sexually violent predators." However, the trial court rejected that basis for defendant's petition based solely on the jury's verdict in defendant's commitment trial. Because the jury in defendant's commitment trial did not necessarily decide the validity of defendant's diagnosis, and defendant's petition presented a nonfrivolous basis on which the court might conclude defendant is no longer an SVP, we conclude the trial court erred.

The validity of a diagnosis of paraphilic coercive disorder has been the subject of scholarly debate. (*People v. Smith* (2013) 216 Cal.App.4th 947, 952 (*Smith*), quoting Frances & First, *Paraphilia NOS, Nonconsent: Not Ready for the Courtroom* (2011) 39 J. Psychiatry & L. 555; *State v. Donald DD.* (N.Y. 2014) 21 N.E.3d 239, 247 & fn. 6; *McGee v. Bartow* (7th Cir. 2010) 593 F.3d 556, 579-580 & fns. 14-15; Bearden, *The Reality of the DSM in the Legal Arena: A Proposition for Curtailing Undesired Consequences of an Imperfect Tool* (2012) 13 Hous. J. Health L. & Pol'y 79, 96-97.) Much of the debate centered on whether paraphilic coercive disorder warranted inclusion in the fifth edition of the DSM, in part because of the widespread use (and alleged misuse) in SVP commitment proceedings of disorders recognized by the DSM. (E.g., Knight, *Is a Diagnosis Category for Paraphilic Coercive Disorder Defensible?* (2010)

17

39 Arch. Sex Behav. 419; Stern, *Paraphilic Coercive Disorder in the DSM: The Right Diagnosis for the Right Reasons* (2010) 39 Arch. Sex Behav. 1443; Wollert, *Paraphilic Coercive Disorder Does Not Belong in the DSM-5 for Statistical, Historical, Conceptual, and Practical Reasons* (2011) 40 Arch. Sex. Behav. 1097.)

In response to that debate, the editors of the fifth edition of the DSM made significant changes to the criteria for diagnosing paraphilic disorders to more clearly distinguish between "atypical human [sexual] behavior and behavior that causes mental distress to a person or makes the person a serious threat to the psychological and physical well-being of other individuals." (Am. Psychiatric Assn., Paraphilic Disorders (2013) p. 1 [fact sheet].)[9] "The fifth edition's description of paraphilia does not reference 'nonconsenting persons' as did the fourth edition's, and the fifth edition does not otherwise allude to paraphilic coercive disorder." (*Johnson*, *supra*, 235 Cal.App.4th at p. 86, fn. omitted.) However, that the DSM no longer recognizes defendant's diagnosis is not dispositive in SVP proceedings. "The federal constitution does not require an SVP's commitment to be based on a disorder that is uniformly recognized by the mental health community." (*Id*. at p. 89.) Nor does the SVPA. (*Id*. at p. 91 ["The SVPA does not refer to the DSM, much less require an SVP's mental disorder be listed in it"].)

---

[9] Available at <http://www.dsm5.org/Documents/Paraphilic%20Disorders%20Fact%20Sheet.pdf> (as of July 23, 2015).

18

In *Kansas v. Hendricks* (1997) 521 U.S. 346, the court upheld the Kansas SVPA against due process and ex post facto challenges. The defendant in that case argued that a finding of "mental illness" was a constitutional prerequisite for civil commitment, and that the Kansas statute was constitutionally infirm because it permitted commitment based on a finding of "mental abnormality," "a term coined by the Kansas Legislature, rather than by the psychiatric community." (*Id.* at pp. 358-359.) The high court rejected the notion that the term "'mental illness,'" as used in its prior cases, had "any talismanic significance." (*Id.* at p. 359.) "Not only do 'psychiatrists disagree widely and frequently on what constitutes mental illness,' [citation], but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. [Citations.]" (*Ibid.*) The court noted that it had "never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes," and instead "traditionally left to legislators the task of defining terms of a medical nature that have legal significance. [Citation.]" (*Ibid.*) Finally, the court recognized that "[l]egal definitions, . . . which must 'take into account such issues as individual responsibility . . . and competency,' need not mirror those advanced by the medical profession. [Citation.]" (*Ibid.*; see *Hubbart*, *supra*, 19 Cal.4th at p. 1156 ["because of their specialized purpose, civil commitment statutes may not express mental health concepts in terms identical to those used by the psychiatric community"]. )

Nonetheless, when reviewing a petition for release under section 6608, subdivision (a), a court should not ignore the controversial nature of an SVP's diagnosis.

19

"[T]he existence of a psychiatric debate about [the] validity [of a diagnosis of paraphilic coercive disorder] 'is a relevant issue in commitment proceedings and a proper consideration for the factfinder in weighing the evidence that the defendant has the "mental disorder" required by statute.'" (*Brown v. Watters* (7th Cir. 2010) 599 F.3d 602, 612; accord, *State v. Shannon S.* (N.Y. 2012) 980 N.E.2d 510, 514 ["any issue pertaining to the reliability of paraphilia NOS as a predicate condition for a finding of mental abnormality has been viewed as a factor relevant to the weight to be attributed to the diagnosis, an issue properly reserved for resolution by the factfinder"].)  In other words, a colorable argument that a civil committee's diagnosis is invalid should not be rejected when making a threshold determination of frivolousness under section 6608, subdivision (a), and it should be left for the trier of fact to determine after hearing expert testimony.

As noted, in its oral ruling, the trial court rejected defendant's argument about the validity of paraphilic coercive disorder based solely on the jury's verdict in defendant's commitment trial:  "[T]he jury did find by proof beyond a reasonable doubt having heard experts on both sides of this issue, proof beyond a reasonable doubt that the defendant did, in fact, have a diagnosed mental disorder that made him a danger to the health and safety of others and that it was likely that he would engage in serious violent criminal behavior."  Had the jury in defendant's commitment trial actually heard conflicting evidence on the validity of paraphilic coercive disorder, we might agree with the trial court's reasoning.  The SVP in *Johnson* was also diagnosed with paraphilic coercive disorder.  (*Johnson*, *supra*, 235 Cal.App.4th at p. 85.)  At his commitment trial, the

20

state's experts testified, without objection, that Johnson met the definition of "paraphilic coercive disorder" because he was sexually aroused or gratified by having sex with nonconsenting victims. (*Ibid*.) One of Johnson's experts testified that paraphilic coercive disorder is a valid but very rare disorder that did not apply to Johnson, and a second expert testified that the diagnosis simply does not exist, and if it does exist, Johnson did not satisfy the criteria for the diagnosis. (*Id*. at p. 86.) A unanimous jury found beyond a reasonable doubt that Johnson was an SVP. (*Id*. at p. 87.)

In petitions for writ of habeas corpus based on new evidence, Johnson argued that the fifth edition of the DSM—published after his trial—no longer recognized paraphilic coercive disorder, so it was no longer a valid mental disorder on which an SVP commitment may be based. (*Johnson*, *supra*, 235 Cal.App.4th at pp. 87-88.) The appellate court disagreed. "Even if the fifth edition [of the DSM] reflects a growing skepticism in the psychiatric community about paraphilic coercive disorder, we cannot conclude that a commitment based on that disorder violates due process, thereby completely undermining the state's case against Johnson." (*Id*. at pp. 90-91.) Moreover, the court concluded the scholarly debate about the validity of paraphilic coercive disorder did not undermine the state's expert testimony about the disorder. (*Id*. at p. 91.) Important for our purposes, the appellate court noted the main thrust of Johnson's argument was actually presented to the jury and rejected. "We think it worth reiterating that the validity of paraphilic coercive disorder was fully litigated at Johnson's trial. Johnson did not object to the introduction of the state's experts' testimony on the subject,

21

and he was able to cross-examine those experts and present the testimony of his own experts. [Citation.]" (*Id.* at pp. 91-92, fn. omitted.) Therefore, even if Johnson had been able to introduce evidence that the fifth edition of the DSM no longer recognizes paraphilic coercive disorder, the result would have been the same. "Regardless of the publication of the DSM's fifth edition, the record before us includes substantial evidence that paraphilic coercive disorder is a legitimate diagnosis and that Johnson suffers from it." (*Id.* at p. 92.)

Unlike in *Johnson*, the record before us does not demonstrate that the validity of paraphilic coercive disorder was actually litigated in defendant's commitment trial. The prosecution introduced no evidence or court records in opposition to defendant's petition, and there is no indication that the trial court reviewed the transcripts from defendant's commitment trial, which are not before this court either. At most, the minutes indicate the trial judge considered the arguments of counsel and Alumbaugh's report. We find nothing in the record to support the trial court's assertion that the jury in defendant's commitment trial "heard experts on both sides of this issue." All we can infer from the fact of the jury's verdict is that it found beyond a reasonable doubt that defendant suffered from a mental disorder and satisfied the criteria for commitment as an SVP. We therefore decline to assume, as did the trial court, that the jury actually heard evidence in support of and against the scientific validity of a diagnosis of paraphilic coercive disorder, and that the jury concluded it was a valid diagnosis.

In her report, Alumbaugh opined that paraphilic coercive disorder is a controversial and problematic diagnosis for convicted rapists, and she cited to scholarly articles from experts who raise questions about the validity of that diagnosis. Because defendant's petition was supported by evidence that presents a colorable and nonfrivolous question about the validity of his diagnosis of paraphilic coercive disorder, we conclude the trial court erred by finding that argument did not support defendant's request for an evidentiary hearing. We do not decide whether defendant's argument is meritorious. That determination is left for the trier of fact after actually hearing expert testimony on the issue.

b. <u>Passage of Time, Aging, and Health As Factors in Risk of Reoffending</u>

Although the trial court acknowledged defendant's advanced age and his survival of prostate cancer, the court found defendant continued to pose a danger based on his past crimes, the fact he refused to participate in treatment, and his supposed intense negative feelings toward women. The court appears to have dismissed out of hand the possibility that evidence of the passage of time, defendant's advanced age, and his medical condition might demonstrate that defendant is not currently dangerous, stating, "the Court feels to proceed farther with the petition would be frivolous and without merit." The court erred.

The "sheer passage of time" since an SVP's diagnosis and commitment may be a relevant consideration in proceedings under section 6608 because the SVPA requires a current diagnosis of a mental disorder and a finding that the committee is currently dangerous because he is likely to engage in sexually violent conduct in the future.

23

(*Litmon v. Superior Court* (*People*) (2004) 123 Cal.App.4th 1156, 1169; *Butler v. Superior Court* (*People*) (2000) 78 Cal.App.4th 1171, 1180; *People v. Hedge* (1999) 72 Cal.App.4th 1466, 1476.)  "Section 6605, subdivision (a), requires that each person actually committed as an SVP undergo a '*current* examination of his or her mental condition . . . at least once every year.'  (Italics added.)  This suggests the Legislature's recognition that diagnoses can change in light of treatment, severity of mental disorder, changed circumstances, *and the passage of time*."  (*Albertson v. Superior Court* (*People*) (2001) 25 Cal.4th 796, 803, italics added.)

In a related fashion, the advanced age and onset of serious medical conditions of an SVP are potentially relevant factors in determining whether a petition for unconditional release is frivolous, because various studies have concluded that recidivism rates decrease significantly among older male sex offenders.  (See, e.g., *Doe v. Sex Offender Registry Board* (Mass. App. Ct. 2014) 4 N.E.3d 1264, 1270-1272 & fns. 7-8, 10-14 [citing scholarly literature on aging and sex offenders].)

In *Reynolds*, the defendant's petition for unconditional release alleged four years had passed since his original commitment, making it less likely he would reoffend.  (*Reynolds*, *supra*, 181 Cal.App.4th at p. 1406.)  Although this court recognized the passage of time was defendant's "strongest contention," we found the defendant's mere allegation was insufficient.  (*Id*. at p. 1410.)  "[I]nstead of attaching the opinion of an evaluator indicating that the passage of time had reduced his potential risk, or citing treatises or journals to support his position that recent research points to the positive

24

effects of aging in reducing risk of reoffending, defendant merely refers to recent transcripts of SVP proceedings which are not before us." (*Ibid*.) We concluded the petition was frivolous, that defendant's attorney did not render ineffective assistance of counsel by conceding the petition did not allege changed circumstances, and affirmed the order denying it without conducting an evidentiary hearing. (*Id*. at pp. 1411-1412.)

In contrast, Alumbaugh cited research indicating that the passage of time and aging are highly relevant in determining whether an SVP continues to pose a risk to public safety. For example, Alumbaugh reported that an evaluation prepared in 2003 described defendant as "highly sociopathic" and gave defendant a PCL-R score of 26, but that report made no mention of the fact that a score of 26 on the PCL-R is below the cut-off of 30 for the label psychopath and made no mention of defendant's advancing age. The same PCL-R score and description of defendant was repeated in reports prepared between 2008 and 2012. According to Alumbaugh, the PCL-R manual itself indicated that a PCL-R score is irrelevant in predicting future violent behavior of older men, and that after age 40 to 45 even a high score is not an accurate predictor. Alumbaugh also cited published studies which reported age-related reductions in psychopathy, including one report which concluded that after age 45 "there were few differences between psychopathic and non-psychopathic offenders."

Moreover, when discussing defendant's score of 4 on the Static-99R, Alumbaugh opined that defendant's score was not an accurate predictor of his future dangerousness because the studies of recidivism rates in sex offenders, on which the Static-99R is based,

25

were comprised of men with a median age of 39. Alumbaugh also reported that "the developers of the Static-99R have stated the recidivism rates do not apply to individuals over the age of 70." Alumbaugh cited various studies and statistics from the Federal Bureau of Investigations indicating that rates of criminality in general drop significantly in older populations, and that rape in particular is an extremely rare crime for men over the age of 45.

Finally, Alumbaugh reported that defendant suffered from serious medical conditions which, according to Alumbaugh, significantly reduced the risk of his reoffending. For instance, Alumbaugh reported that defendant had a declined sex drive as early as age 40, and was left impotent after undergoing radiation therapy for prostate cancer. Defendant's medical charts also indicated that defendant had one testicle surgically removed. Defendant also suffered from heart disease and had two stents implanted in his coronary blood vessels, and he was provisionally diagnosed with multiple sclerosis. Alumbaugh opined that biological issues and age-related illnesses contribute to a decline in recidivism among older sex offenders, and she cited a study on reduced sexual arousal among older sex offenders and another study on the prevalence and severity of erectile dysfunction among men with diabetes and heart disease. Alumbaugh opined that defendant's recidivist rate was "so low that it is almost nonexistent."

The evidence cited by Alumbaugh and her expert opinion, supported by citations to published studies, made a colorable showing that defendant's advanced age and

medical condition significantly reduced the likelihood he would reengage in sexually violent behavior, such that defendant was entitled to an evidentiary hearing. Again, we do not determine whether defendant's showing would succeed during a full evidentiary hearing, at which time the prosecution may introduce competing expert testimony, and cross-examine defendant's witnesses.

### c. Refusal to Participate in Sex Offender Treatment

During oral argument before this court, the People contended defendant's refusal to participate in sex offender treatment is dispositive and, based solely on that factor, the People argue the trial court did not abuse its discretion by denying the petition as frivolous. Our dissenting colleague agrees with the People, and concludes, "[w]ithout his participation in treatment, defendant's age and worsening health do not constitute a change in his condition." (*People v. LaBlanc*, E059589, dis. opn. of Codrington, J., at p. 6.)

Although published decisions have implicitly recognized that participation in treatment is an important factor when determining whether an SVP is no longer dangerous (e.g., *Smith*, *supra*, 216 Cal.App.4th at p. 953; *Rasmuson*, *supra*, 145 Cal.App.4th at pp. 1508-1509; *Collins*, *supra*, 110 Cal.App.4th at pp. 351-352), no case has ever held that treatment is dispositive or that an SVP may never show changed circumstances under section 6608 without participating in treatment. Defendant's refusal to participate in sex offender treatment is certainly evidence from which a trier of fact may conclude defendant continues to pose a danger and is therefore not eligible for

unconditional discharge. But the ultimate determination of whether an SVP continues to suffer from a mental disorder that renders him a danger to the public is reserved for the evidentiary hearing under section 6608, subdivision (g), and is not to be conflated with the threshold frivolousness determination under subdivision (a). (*Olsen*, *supra*, 229 Cal.App.4th at pp. 998-999.) While we share our dissenting colleague's concern with defendant's refusal to participate in sex offender treatment, we cannot say that defendant's petition is so utterly lacking in merit that no reasonable attorney would conclude it makes a colorable showing of entitlement to relief. (*Collins*, *supra*, 110 Cal.App.4th at p. 349; *Reynolds*, *supra*, 181 Cal.App.4th at p. 1411.)

d. <u>Conclusion</u>

On the facts presented in this record, we conclude defendant made a colorable, nonfrivolous showing that his diagnosis of paraphilic coercive disorder is not scientifically valid, and that his advancing age and medical condition make it unlikely that he will reoffend and commit sexually violent crimes if he is released. Taken together, these allegations "pass muster" and entitle defendant to an evidentiary hearing on his request for unconditional release. (*Smith*, *supra*, 216 Cal.App.4th at p. 953.) Therefore, the trial court abused its discretion by finding defendant's petition frivolous.

B. *The Record Contains No Evidence That Judge Malone Was Biased Against Defendant or That the Interests of Justice Require His Disqualification on Remand*

Defendant argues that, if we reverse the order denying his petition, we should remand the matter for reassignment to a different judge, pursuant to Code of Civil

28

Procedure section 170.1, subdivision (c). Defendant contends Judge Malone applied the wrong legal standards and there is an appearance that he is biased against defendant and could not fairly conduct an evidentiary hearing on the petition. We disagree, and decline to disqualify Judge Malone.

### 1. Applicable Law

Code of Civil Procedure section 170.1, subdivision (c), provides: "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court." An appellate court must exercise its power to disqualify a judge under that statute sparingly, and only when the interests of justice require it. (*Peracchi v. Superior Court* (*People*) (2003) 30 Cal.4th 1245, 1256; *People v. Landau* (2011) 199 Cal.App.4th 31, 40; *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303.)

An appellate court need not find actual bias in order to invoke Code of Civil Procedure section 170.1, subdivision (c). (*In re Wagner* (2005) 127 Cal.App.4th 138, 148; *Ng v. Superior Court* (*People*) (1997) 52 Cal.App.4th 1010, 1024, disapproved on another ground in *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1069, fn. 6.) The court may order disqualification when necessary to dispel the appearance of bias, for example, when the record shows the trial judge became embroiled or personally invested in the outcome of the proceedings. (*Wagner*, at pp. 147-149 [remanding with instructions that, if the petitioner so requested, the presiding judge of the superior court must reassign

29

the case]; *People v. Dutra* (2006) 145 Cal.App.4th 1359, 1368 [remanding case to another trial judge "to forestall any claim of undue embroilment"].)

Mere judicial error does not establish bias and normally is not a proper ground for disqualification. (*People v. Superior Court* (*Dorsey*) (1996) 50 Cal.App.4th 1216, 1230 [Fourth Dist., Div. Two]; see, e.g., *In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 153 [error in characterization of husband's disability allowance did not create appearance of bias]; *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562 [mere sentencing error did not "reflect a lack of objectivity implicating the interests of justice"].) Proper grounds for disqualification under Code of Civil Procedure section 170.1, subdivision (c), "include 'where a reasonable person might doubt whether the trial judge was impartial [citation], or where the court's rulings suggest the "whimsical disregard" of a statutory scheme. [Citation.]'" (*Alhusainy v. Superior Court* (*People*) (2006) 143 Cal.App.4th 385, 394, quoting *Hernandez v. Superior Court*, *supra*, 112 Cal.App.4th at p. 303.)

2. Analysis

Defendant argues Judge Malone denied his petition "without any apparent understanding of the meaning of the term frivolous or of the relevant law." Defendant's reliance on *In re Z.K.* (2011) 201 Cal.App.4th 51 is misplaced. There, the appellate court reversed an order terminating a mother's parental rights because the juvenile court failed to comply with basic statutory requirements designed to protect the mother's due process rights. (*Id*. at p. 72.) The appellate court concluded that, "[u]nder the circumstances of

30

this case, . . . where the juvenile court terminated mother's parental rights without making the requisite finding of detriment *and without even understanding that such a finding was necessary*—despite clear case law to the contrary," it was "in the interests of justice for a different judge to hear the proceeding on remand." (*Ibid*., italics added.)

In contrast to *In re Z.K.*, the record indicates Judge Malone understood that his task was to determine whether defendant's petition was frivolous or merited a full evidentiary hearing, and that a petition is frivolous if it lacks any merit. Although we conclude Judge Malone erred by denying the petition as frivolous, his understanding of the standard of frivolousness comported to the definitions given to section 6608, subdivision (a). (*People v. McKee*, *supra*, 47 Cal.4th at p. 1192; *Collins*, *supra*, 110 Cal.App.4th at p. 349.)

Nor are we convinced that Judge Malone's error would cause a reasonable person to believe he had already made up his mind and would not act fairly on remand. In his reply brief, defendant cites *People v. Jones* (2010) 186 Cal.App.4th 216. There, the appellate court held: (1) the defendant's appointed attorney rendered prejudicial ineffective assistance of counsel by not conducting sufficient investigation and not eliciting the testimony of two witnesses at a 2006 hearing on the defendant's motion to suppress evidence; and (2) the trial court erred by not finding such ineffective assistance of counsel at a hearing conducted in 2009 following remand from a prior appeal. (*Id*. at p. 244.) The appellate court remanded the case to the presiding judge of the superior court to reassign the case to another judge to conduct a new suppression hearing. (*Id*. at

p. 245.) In a footnote, the majority explained that, although it did not "doubt the objectivity and fairness of the judge heretofore assigned this case," it concluded the judges' "statement that the evidence produced by Jones at the 2009 hearing would not induce him to change his 2006 denial of Jones's initial suppression motion might cause a reasonable person aware of the facts to doubt his ability to be impartial at the rehearing of the suppression motion." (*Ibid.*, fn. 13.)

Unlike in *Jones*, Judge Malone made no comments on the record that would lead a reasonable person to conclude he was biased or that he had already made up his mind, and that he could not come to a different conclusion after conducting a full evidentiary hearing. We find nothing in the record that demonstrates actual bias or the appearance of bias, so defendant's request to disqualify Judge Malone is denied.

During oral argument before this court, defendant's attorney appeared to concede that his request for disqualification pursuant to Code of Civil Procedure section 170.1, subdivision (c), was premature, and that the appropriate means of addressing his concerns would be to request disqualification directly in the trial court. We express no opinion on the merits of counsel's new position.

III.

DISPOSITION

The order denying defendant's petition is reversed.  On remand, the trial court shall conduct an evidentiary hearing on the petition.  Defendant's request to disqualify Judge Malone is denied.

CERTIFIED FOR PUBLICATION


McKINSTER_____
J.

I concur:


RAMIREZ_____
P. J.

[*People v. LaBlanc*, E059589]

CODRINGTON, J., Dissenting.

The majority opinion concludes the trial court's dismissal of defendant's petition as frivolous should be reversed because defendant met his burden of proof by a preponderance of evidence to show the petition was not utterly meritless. Based on defendant's refusal to submit to mental health treatment, I reject the majority holding that the trial court abused its discretion. Accordingly, I respectfully dissent.

Defendant Francis John LaBlanc, who turns 73 in August 2015, was convicted of two rapes in Colorado, committed in 1962 and 1964. In 1964, he admitted to having raped 12 or 15 women in Colorado although he did not know exactly how many. He was known as the "Phantom Rapist."

Defendant has been in prison or under civil commitment for 50 years since 1965, except for a few months in 1985 when he committed two more rapes in San Bernardino County soon after his release from a Colorado prison. In all four cases, he entered the victims' homes and restrained them. One victim had employed him to clean her sofa.

Beginning in 1996, defendant has been held as a sexually violent predator (SVP) in a state hospital with additional stints in prison. He once attempted to escape and was charged with possession of a simulated weapon and destroying public property. During nearly 20 years of commitment as an SVP, defendant has refused to receive mental health treatment. Although Dr. Alumbaugh observed defendant's behavior had improved beginning in 2006, she also described him as contentious, difficult, angry, resentful,

1

fractious, litigious, troublesome, and vindictive. He was negative and adversarial with a female psychiatrist. He was also charged with stalking female staff and possessing contraband.

In January 2013, defendant filed a petition for unconditional release on the grounds that he no longer meets the criteria for an SVP and his condition has changed. (Welf. & Inst. Code, § 6608.) The trial court dismissed the petition as frivolous, citing the jury's finding beyond a reasonable doubt that defendant had "a diagnosed mental disorder that made him a danger to the health and safety of others and that it was likely that he would engage in serious violent criminal behavior."

The meaning of frivolous is not defined by statute. However, the cases agree that the meaning of frivolous is governed by an objective standard: a reasonable attorney would agree a petition is completely without merit. (Code Civ. Proc., § 128.5; *People v. Collins* (2003) 110 Cal.App.4th 340, 349 (*Collins*); *People v. McKee* (2010) 47 Cal.4th 1172, 1192, citing *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

In *Collins*, the appellate court reversed the trial court's dismissal of a petition as frivolous when the defendant supported his petition with evidence of three types: he had health problems; he was participating in sex offender programs and treatment, including undergoing chemical castration; and a psychiatric report stated defendant was not likely to reoffend.

Subsequently, this court affirmed the trial court's dismissal of a petition as frivolous in *People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1405 (Fourth Dist., Div. Two).  In *Reynolds,* defendant's counsel ultimately conceded there were no changed conditions supporting the petition.  (*Id.* at pp. 1406-1409.)  Justice Ramirez commented that "[d]efendant's strongest contention was that four years had passed since his initial commitment" (*id.* at p. 1410) but "[t]he passage of time and the previous availability of a single favorable witness in 2007 do not establish even a prima facie basis for relief, such as would entitle him to a hearing."  (*Id.* at pp. 1410-1411.)

In *People v. Smith* (2013) 216 Cal.App.4th 947, 953 (*Smith*), the appellate court held that there was no substantial evidence that a defendant's petition was frivolous, as conceded by the People, based on several factors:  first, defendant "had made 'significant progress' in his treatment and that, in some respects, matters outside his control prevented him from progressing to the required level for release; [next, factors that] undermine the validity of the diagnosis [of paraphilia "Not Otherwise Specified" (NOS)] that led to his commitment; and, if believed, they indicate that this diagnosis, which indicates he is a danger to others, no longer applies.  There is no substantial evidence to support a finding that appellant's petition is totally and completely without merit or for the purpose of harassment."  (Fn. omitted.)

Notably, the defendants in *Collins* and *Smith*, unlike defendant LaBlanc, were actively engaged in medical and psychological treatment to reduce their risk of

3

reoffending.  Similarly, in the recent case of *People v. Olsen* (2014) 229 Cal.App.4th 981, 989-990 (*Olsen*), defendant, a transgendered male who committed six rapes between 1972 and 1980, based her petition for release on a psychologist's opinion that her participation in treatment had eliminated any risk of reoffending:  "'Her risk to the community is low at this time.  She knows what she needs to do to maintain her sobriety and her relapse prevention plan is very realistic, as well as grounded to continue outpatient therapy and use those around [her] who are aware of her past behaviors to keep her in line by her sharing what her needs are appropriately. . . .  [¶]  . . . [I]t is my professional opinion, based on data, that [defendant] **does not meet** criteria as a sexually violent predator as described in [Welfare and Institutions Code] Section 6600 . . . .'"  In *Olsen*, the appellate court remanded the case for the trial court to apply the appropriate standard for a determination of frivolousness.  (*Id*. at p. 990.)

I acknowledge, as stated in the majority opinion, that no case has expressly held that an SVP cannot show changed conditions without participating in treatment.  However, all the cases which have found a petition was not frivolous have involved SVPs who have participated in treatment.  Furthermore, treatment is an essential aspect of the Sexually Violent Predator Act (SVPA), which "provides for the involuntary civil commitment, for treatment and confinement, of an individual who is found by a unanimous jury verdict ([Welf. & Inst. Code,] § 6603, subds. (e), (f)), and beyond a reasonable doubt ([Welf. & Inst. Code,] § 6604), to be a 'sexually violent predator'

4

(*ibid*.).” (*Olsen*, *supra*, 229 Cal.App.4th at p. 991.) As expressly stated in the statute: “If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement . . . .” (Welf. & Inst. Code, § 6604.)

The statutes also recognize the right to refuse treatment bears significantly on whether a person’s condition has changed: “Where the person’s failure to participate in or complete treatment is relied upon as proof that the person’s condition has not changed, and there is evidence to support that reliance, the jury shall be instructed substantially as follows: [¶] ‘The committed person’s failure to participate in or complete the State Department of State Hospitals Sex Offender Commitment Program (SOCP) are facts that, if proved, may be considered as evidence that the committed person’s condition has not changed. The weight to be given that evidence is a matter for the jury to determine.’” (Welf. & Inst. Code, § 6605, subd. (a)(3).)

Nevertheless, in *People v. Sumahit* (2005) 128 Cal.App.4th 347, 355, the appellate court held there may be consequences for refusing treatment: “The SVPA’s primary goal is treatment. ‘The Act provides treatment for mental disorders from which [sex offenders] currently suffer and reduces the threat of harm otherwise posed to the public. No punitive purpose was intended.’ ([*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144].) Despite the fact that defendant is amenable to and has been offered

5

treatment, he refuses to attend, believing he is not a danger to the community . . . . [¶] Defendant has the right to refuse treatment." But a defendant may not be able to do so and at the same time assert there has been a change in his condition.

Defendant LaBlanc was committed for treatment as an SVP. He has consistently refused treatment for 20 years or more. I agree with the trial court there has been no apparent change in his condition. He cannot simply wait for enough time to elapse. Without his participation in treatment, defendant's age and worsening health do not constitute a change in his condition. Even if he is impotent or incapacitated as he claims, he could commit other kinds of sexual violence. Given the severity of defendant's multiple rapes, the failure to accept treatment while committed, and defendant's negative feelings towards women, defendant remains a danger to society. Under these circumstances, he cannot show his petition for release is not frivolous. Therefore, I respectfully dissent from the majority opinion reversing the trial court's dismissal of defendant's petition as frivolous.

CODRINGTON
J.