Filed 1/20/26  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OSVALDO APOLO LOPEZ,<br><br>    Defendant and Appellant. | D084046<br><br><br><br>(Super. Ct. No. SCS297472) |


APPEAL from an order of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Reversed and remanded with directions.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley, Marvin E. Mizell, and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Osvaldo Apolo Lopez appeals the second denial of his motion for discovery under the Racial Justice Act and seeks a new trial judge to oversee the matter on remand.  (Pen. Code, § 745, subd. (d).)  We previously

remanded the matter for reconsideration of the motion under the "plausible justification standard" for good cause explained in *Young v. Superior Court* (2022) 79 Cal.App.5th 138. (*People v. Lopez* (Nov. 28, 2023, D080443) [nonpub. opn.].) On remand, the trial court again denied Lopez's RJA discovery motion. The People concede discovery should have been granted, but disagree reassignment is warranted.

We conclude Lopez satisfied the low bar for RJA discovery, and thus we reverse the denial order and remand for the trial judge to determine the appropriate scope of discovery. We also direct the matter to be reassigned to a different trial judge on remand, in the interests of justice, based on comments made after the motion ruling.

## I.

For context, we repeat the facts underlying Lopez's conviction and some of the procedural history from our earlier unpublished opinion. (*People v. Lopez*, D080443.)

## A.

The state charged Lopez with the murder of Ricardo Sales. Sales had an ongoing affair with Lopez's wife. When he learned of the affair, Lopez called Sales to tell him not to contact his wife anymore. Lopez testified that Sales identified himself as a gang member, threatened Lopez and his family, and demanded to meet.

During that meeting, Lopez shot Sales dead. Witnesses saw Lopez shoot Sales and then stand over the fallen body and continue shooting.

At trial, Lopez offered testimony explaining how his gang-related trauma made him more likely to believe his life was in danger and more "emotionally reactive" to perceived threats. After Sales punched him in the back of the head, making him fall, Lopez thought Sales was going to kill him.

2

In response, Lopez pulled out a gun and "started shooting." He felt "disoriented" and "hazy," with "tunnel vision." Unsure if he had shot Sales, Lopez "kept squeezing [the trigger] until it looked like he wasn't going to get back up."

The jury found Lopez guilty of voluntary manslaughter, a lesser included offense of murder. (Pen. Code, § 192(a).) The jury also found true that Lopez used a firearm during the offense. (§ 12022.5(a).)

The trial court sentenced Lopez to the middle term of six years for voluntary manslaughter and the low term of three years for the firearm enhancement, for a total of nine years in prison.

B.

Before sentencing, Lopez moved (1) to dismiss the firearm enhancement under the RJA and (2) for RJA discovery. Lopez relied on statistical data from a study examining death penalty charging in San Diego County; a comparison of his case with a homicide case involving a White shooter; and evidence of what Lopez's counsel viewed as implicit bias in the prosecutor's sentencing briefing because it invoked "a very real and insidious stereotype that Latinx men are prone to jealousy" as confirmed by a list of scholarly articles.[1] He argued imposing the firearm enhancement "would amount to a violation of the" RJA and asserted good cause for RJA discovery to obtain copies of all charging documents in homicide cases filed by the San Diego District Attorney's office between January 1, 2017, and February 24, 2022, the date of the motion.

---

[1] We grant Lopez's unopposed request for judicial notice of the prior record of appeal in case No. D080443, including these documents submitted in support of his RJA discovery motion. (Evid. Code, §§ 452(d), 459(a).)

The trial court denied both motions.  On the discovery motion, the trial court stated, "If this Court cannot find a prima facie showing [of a substantive RJA violation], I don't know how [it] can find a showing of good cause that the discovery in this case should be released."

C.

Afterwards, *Young* clarified that good cause for RJA discovery is a "minimal" plausible justification standard less onerous than the prima facie showing of an RJA violation under section 745(c) that "should not be difficult to meet."  (*Young*, 79 Cal.App.5th at pp. 159, 161.)

In denying Lopez's RJA discovery motion, the trial court acted without *Young*'s guidance and appeared to equate the different standards under section 745(c) and (d), so we reversed and remanded for the trial court to reconsider the motion as guided by *Young*.  (*People v. Lopez*, D080443.)

D.

On remand, Lopez filed a supplemental pleading in support of his request for RJA discovery of "the charging documents from all homicide cases from January 2017 through the present date."  He argued good cause for this discovery based on his original submission as well as a list of 35 homicide cases assigned to the Office of the Primary Public Defender between 2017 and 2020, which he offered as "a small statistical sampling of what he hopes to develop."

The trial court again denied Lopez's motion for RJA discovery because it did not find good cause "even under the lower standard."

II.

A.

We asked the parties to address whether the court's denial of Lopez's RJA discovery motion is an appealable order in light of *In re*

4

*Montgomery* (2024) 104 Cal.App.5th 1062, 1071-1072 and *People v. Serrano* (2024) 106 Cal.App.5th 276, 292. The parties agree it is, as do we. *Montgomery* and *Serrano* each involved a *postjudgment* RJA discovery motion that was consequently not appealable. (*Montgomery*, at p. 1066; *Serrano*, at p. 283.) Here, in contrast, Lopez first sought RJA discovery and relief during sentencing proceedings *before* judgment was entered. The matter of that same RJA discovery motion returns to us following our remand for the trial court to reconsider it. We thus view it as a continuation of Lopez's original and appealable motion made presentencing.

B.

Lopez contends, and the People concede, the trial court erred in denying Lopez's motion for RJA discovery. We accept the People's concession.

Good cause for RJA discovery requires only a "plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act 'could or might have occurred.'" (*Young*, 79 Cal.App.5th at p. 159.) Here, the People admit "the statistical and academic materials presented," as described above, "satisfy [*Young*'s] minimally stringent requirements for discovery, entitling [Lopez] to further evidentiary development of his RJA claim." In addition to the statistical and academic materials, which include scholarly articles about racial stereotypes of "Latinx men," Lopez pointed to at least nine instances in a sentencing brief where "the district attorney assert[ed] and implie[d] . . . Lopez was motivated by jealously over an affair." Together, Lopez argued this evidence "demonstrates a very real possibility of implicit bias on the part of the District Attorney's Office." "At this stage, [the defendant] need not make a strong case but only a plausible one." (*Young*, 79 Cal.App.5th at p. 166.) In accepting the People's concession, we conclude this suffices to establish good cause for RJA discovery.

5

Although Lopez contends the scope of his discovery request was appropriate, the trial court did not reach that issue. (See *McDaniel v. Superior Court* (2025) 111 Cal.App.5th 228, 248-249, fn. 9.) "[H]ow much of this requested data may be ordered disclosed, when, and in what form, is for the trial court to consider, in an exercise of its discretion, weighing probative value against burden." (*Young*, 79 Cal.App.5th at p. 169.) We accordingly remand for the trial court to exercise its discretion to decide the appropriate scope of disclosure by weighing the factors *Young* sourced from *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134:

- whether the material requested is adequately described;
- the material's relative availability to the responding entity and the defendant;
- the request's timeliness;
- the risk of causing unreasonable delay or imposing an undue burden on the responding entity; and
- the risk of violating third-party confidentiality, privacy rights, or protected governmental interests.

(*Young*, at p. 168.)

## C.

Finally, invoking Code of Civil Procedure section 170.1(c), Lopez asks us to assign this matter to a different trial judge on remand. We direct the presiding judge of the superior court to do so.

At a party's request, we must consider if the interests of justice favor directing further proceedings to be heard before a different trial judge. (Code Civ. Proc., § 170.1(c).) Such power is to be used "sparingly." (*People v. LaBlanc* (2015) 238 Cal.App.4th 1059, 1079.) We may reassign the trial judge in the interests of justice "when necessary to dispel the appearance of

6

bias, for example, when the record shows the trial judge became embroiled or personally invested in the outcome of the proceedings" (*ibid.*)—in other words, "where a reasonable person might doubt whether the trial judge was impartial" (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303). "Mere judicial error" is normally not enough. (*LaBlanc*, at p. 1079.)

The basis for Lopez's reassignment request comes from a conversation between the trial judge and defense counsel after the court had ruled on Lopez's RJA discovery motion. Following the ruling, defense counsel made a record of what she believed established good cause. Defense counsel finished making her record, after which the trial judge expressed that he had "never been more disappointed in a counsel that I had a lot of respect for" based on the trial judge's belief that defense counsel called the prosecutor a racist. Defense counsel denied calling the prosecutor a racist. But the trial judge insisted, "Yes, you did. *At the original sentencing hearing*, you called him a racist." (Italics added.) Defense counsel clarified that she "never said that [the prosecutor] was being explicitly racist. This is about implicit bias." Even so, the trial judge continued to accuse defense counsel of calling the prosecutor a racist at sentencing and told her, "you're not respecting the rules of professional conduct when you call a fellow attorney a racist." (Contra conc. & dis. opn. at p. 10.) When defense counsel explained she was "doing [her] job" under the RJA by calling out implicit bias, the trial judge referenced "[h]ow many courses" he had "been to on implicit bias." When defense counsel expressed that "part of the problem with RJA litigation" was "probably . . . the hostility of the Bench," the trial judge responded, "Oh, no, no, no, no. You're not going there because" he had granted RJA discovery motions "on a number of occasions." Then the trial judge returned to his

7

belief that defense counsel "call[ed] another attorney a racist based on something that clearly could have risen out of jealousy."

We have reviewed the entire sentencing transcript and confirmed defense counsel never accused the prosecutor of explicit racism at the sentencing hearing; instead, at the hearing she grounded her arguments in implicit bias.

Lopez contends the trial judge's "displeasure with trial counsel escalated to what can only be described as hostile, with the court seemingly taking on the role of advocate in tandem with the prosecutor." The People argue "it was not irrational for the court to interpret [Lopez's] arguments against the prosecutor as encompassing claims of both implicit and explicit racial bias." In any event, the People categorize "misinterpreting counsel's argument" as "not evidence of partiality" but rather the court expressing a view on a legal or factual issue presented in the proceeding, which they say is "specifically excluded as a basis" for reassignment under Code of Civil Procedure section 170.2(b). Yet section 170.2(b) expressly permits such conduct to serve as a ground for reassignment as provided in section 170.1(c).

On this record, we conclude the interests of justice counsel in favor of reassigning further proceedings to be heard before a different trial judge. A reasonable person might view the trial judge as having become embroiled in the proceeding. Our decision does not constitute a determination the trial judge in this case exhibited actual bias. (See *LaBlanc*, 238 Cal.App.4th at p. 1079.)

## III.

We reverse the order denying Lopez's motion for discovery under Penal Code section 745(d) and remand with directions that the presiding judge of the superior court reassign the matter to a new trial judge. On remand, the

8

new trial judge is directed to exercise its discretion to determine the appropriate scope of discovery by weighing the factors identified in *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 168, citing *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134.

CASTILLO, J.

I CONCUR:

O'ROURKE, Acting P. J.

Kelety, J., concurring in part and dissenting in part.

I too accept the People's concession that the trial court erred in denying Lopez's motion for discovery under the Racial Justice Act (RJA) and join the majority in concluding that the matter must be remanded so that the trial court may consider the appropriate scope of discovery. The Legislature has made its position quite clear: "The Legislature . . . intends that individuals must be afforded access to a broad range of relevant discovery to develop and support their *potential* RJA claims." (Assembly Bill No. 1071 (Stats. 2025, ch. 721, § 1, subd. (b), italics added.)

However, in my view, the comments made by the trial judge after ruling on Lopez's RJA discovery motion did not reflect bias or partiality in connection with the motion, and therefore the matter should not be reassigned on remand.

Code of Civil Procedure section 170.1 subdivision (c) provides that upon appeal, we consider "whether in the interests of justice [we] should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order" is under review. Cases have interpreted the phrase "interests of justice" as asking us to consider whether a reasonable person might doubt whether the judge was impartial in ruling on the matter before it, or where the orders appealed from reflect "bias or whimsy." (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303.)

Here, nothing in the record indicated that the judge's order was whimsical in any sense. Further, as discussed *post*, there is no reason to doubt the judge's impartiality in assessing Lopez's RJA claim in future proceedings. The judge noted his awareness of the implicit bias issue, pointed out that he had granted RJA discovery motions in the past, and

highlighted his experiences as a judicial officer in the community. He flatly rejected any suggestion that he was hostile to the RJA.

Instead, the comments of the court, after ruling on the motion, focused on the conduct of counsel as it played out in the posttrial pleadings and proceedings before him.

It bears noting that the jury's verdict was not well received in all quarters. For his part, Lopez no doubt had hoped for complete acquittal. On the other hand, as the probation report noted, the victim's family was "very upset" that Lopez had been convicted of voluntary manslaughter, rather than first or second degree murder. The court referenced the emotion of the case in the original sentencing hearing, admonishing the respective families to maintain the peace between them, and commending them for remaining calm at the end of the hearing.

An understanding of the court's comments to defense counsel, as referenced in the majority opinion, requires a review of the posttrial proceedings. This review demonstrates that the emotion in the case was not limited to the families of the defendant and the victim and shows why the judge raised his concerns with defense counsel. It appears that the proceedings before the court were growing increasingly heated between the parties and that the court assigned at least some of the responsibility for that "heat" to the statements of defense counsel, both in the pleadings and at the posttrial hearings.

On February 4, 2022, Lopez filed a lengthy sentencing memorandum and statement in mitigation, which included arguments in mitigation discussing Lopez's history of trauma and included family photos and letters of support. Also included were two letters from trial jurors that referred to Lopez's prior trauma, as well as a letter from a third juror stating that

2

"[Lopez's] wife's drug addiction, affair, and involvement with an active gang member . . . led to Mr. Lopez's downfall."

On February 7, 2022, Lopez filed a supplemental sentencing memorandum addressing the probation report, which had recommended a ten year sentence, again arguing that Lopez's history of trauma was a contributing factor in the offense under Penal Code section 1170 subdivision (b)(6), and requesting a probationary sentence or a lower term sentence.

On February 9, 2022, Lopez filed a second supplemental sentencing memorandum, raising proportionality as an issue and discussing the facts of a recent prosecution, *People v. Russell*, in which a White deputy sheriff shot and killed a fleeing suspect. Lopez argued that the RJA required the court to give strong weight to the fact that the district attorney had allowed Russell to plead guilty to voluntary manslaughter but had not made the same offer to Lopez.

On the same date, February 9, the People filed a brief sentencing memorandum, arguing that a sentence to prison was appropriate. The memorandum did not reference jealousy or mention the affair between Lopez's wife and the victim.

Then, on February 18, 2022, the People filed a supplemental sentencing memorandum and statement in mitigation. This memorandum noted that the day before the shooting, Lopez learned that his wife was involved in an extramarital affair with the victim, ordered the victim to end the affair, agreed to meet the victim the next day, and armed himself with the firearm. It argued for the middle term and argued against probation. It noted that Lopez had made the choice to "arm himself with a deadly weapon and confront the man who was having an affair with [his] wife." It further noted that "[e]ven though [he] was certainly under the influence of emotion based

3

on finding out his wife was having an extramarital affair and using methamphetamine with [the victim]" he acted "with a sense of calm planning and sophistication throughout the homicide and after." It further noted that Lopez "was overwhelmed with severe emotions that kept him awake all night and unable to perform his job the next day," and that his "emotions likely began to boil over" when he met with the victim. It disputed that Lopez had made a sufficient showing under the RJA. It closed with a recommendation for a ten-year prison term. The People's supplemental memorandum never used the words "jealous" or "jealousy."

On February 22, 2022, Lopez filed his response to the People's supplemental sentencing memorandum. It argued that the memorandum was a "vindictive" response to Lopez's February 9 filing because it reflected a change in the People's position from their earlier filing—which recommended prison but did not state a specific recommended term—to the more recent 10-year prison term recommendation in the memorandum. Lopez alleged this change was a vindictive response to Lopez's February 9 filing referencing the RJA and proportionality. Lopez's response disputed the District Attorney's characterization of the evidence at trial:

> "[T]he district attorney's supplemental sentencing brief never once respectfully acknowledges that Mr. Lopez has a fear of gang violence or has a documented history of severe trauma. Instead, the district attorney asserts and implies in its sentencing brief on at least nine separate occasions that Mr. Lopez was motivated by jealousy over an affair.[1]
>
> "Defense counsel is therefore concerned that the district attorney's office is promulgating, perhaps even

---

[1] As noted above, although the People's supplemental sentencing memorandum referred to the affair and the emotions that Lopez likely experienced upon learning of it, the brief never used the words "jealous" or "jealousy."

4

unconsciously, a racist stereotype about Latinx or Chicano men. [¶ . . . ¶]

"And in this case, where all the trial evidence demonstrated that Mr. Lopez was motivated by fear and not jealousy, the court should be disturbed by the district attorney's continued assertions that this is a case about a man who was jealous of his wife's paramour . . . ."

Lopez urged the court to dismiss the firearm enhancement via the RJA.

On the same day, February 22, Lopez filed a motion for discovery under the RJA seeking copies of all charging documents in homicide cases filed by the District Attorney's office between January 1, 2017 and February 24, 2022, to determine whether the District Attorney sought to impose more serious sentences for non-White individuals than for similarly situated White individuals.

On February 28, 2022, the People filed a third pleading entitled Reply to Vindictive Prosecution & Racial Justice Act Violation Allegations. The People contended that "[t]here is not a scintilla of evidence that the District Attorney's Office or the assigned deputy district attorney demonstrated any race-based bias, implicit or otherwise." The People noted concerns "about the escalating nature of the rhetoric in this case . . . ." It rejected the narrative that its sentencing recommendation was vindictive and argued that Lopez had not established good cause for discovery under the RJA. It contended that allegations of racism against the office were "both perplexing and deeply offensive." It stated,

"[T]o suggest that somehow it is racist to say that a husband would be moved to anger when another man had an affair with his wife, is simply preposterous. It requires little common sense to understand that this is a universal and completely understandable sentiment that transcends race . . . [and] to accuse the deputy of racism (with no basis)

5

in a sentencing proceeding is not an honest pursuit of the [RJA]."

The People cited to *People v. Jackson* (1971)18 Cal.App.3d 504, 509 ("a trial judge must alertly supervise proceedings in his court, curbing when necessary over-zealous advocates").

At the sentencing hearing on March 2, 2022, a hearing that the court characterized as "emotional," defense counsel recounted the chronology of the sentencing pleadings and asserted that the chronology established a prima facie case of vindictive prosecution. When the District Attorney's ethics coordinator addressed the court, characterizing the RJA issues as a "sideshow," the court rebuked his "language". The coordinator continued on to state that the "racial accusations" were "deeply offensive to our office."

In addressing the applicability of the RJA to the case, the judge noted that he had been in the criminal justice system for over 30 years, including over 16 years as a prosecutor, 2 years as a commissioner, 5 years as a dependency judge, 5 years as a readiness judge, and 5 years as a criminal trial judge. He stated that he had taken implicit bias classes and was keenly aware of issues of implicit bias before the court. He relied on this extensive experience as well as on "everything that has been filed in this case" in denying the defense request to find that the RJA applied to the case and that discovery should be ordered.

After ruling on the RJA motion, the court turned to sentencing. The court heard from the victim's family and friends, including those who referenced the issue of marital infidelity. ("Why did you choose to kill my son over an affair your wife had?"; "You shot my son over a female"; and, "If that was [the jurors'] wife, they would have been angry as well.") The court sentenced Lopez to nine years custody. The court did not comment on the conduct of either counsel at this hearing.

6

The tension on the issues apparently did not abate in the two years that elapsed between the sentencing and the hearing on remand.

On April 8, 2024, after remand, Lopez filed a pleading based upon *Young v. Superior Court* (2022) 79 Cal.App.5th 138 and Penal Code section 745 subdivision (d), again asking the court to grant the requested discovery. The pleading discussed intervening case law, and contended bias could be seen in available statistics, in disparate treatment of people of color, and "in the coded language used in the district attorney's pleading at sentencing." It asserted that "the district attorney filed a statement in aggravation which suggested on nine separate occasions that he committed manslaughter because of jealousy over an affair—despite the jury's finding that he acted in imperfect self-defense when his life was threatened and despite the fact that there was no evidence at trial that he was motivated by sexual jealousy."

The People responded on April 15, 2024, arguing that the court no longer had jurisdiction to consider the matter, because Lopez was no longer in prison and that because he had served his time, there was no relief that the court could give him under the RJA. The People noted that, "No one—not this court—not even Cher can 'turn back time.' "

Lopez's reply was filed on April 19, 2024, stating that Mr. Lopez was still on parole and the court retained jurisdiction. In its conclusion, Lopez contended that the Legislature did not "want prosecutors to flippantly make jokes about popular music in their pleadings on the subject [of racism in the criminal justice system]."[2]

_____

[2] Cher's song did not reference race or jealousy or marital infidelity, but was instead a song of regret to a former lover about hurtful words that could not be taken back.

At the hearing on remand, the District Attorney's ethics coordinator appeared to argue that the Public Defender's Office was not bringing the motion to assist Lopez, who was no longer in custody, but instead to use the discovery for its future clients. The court cut off the People's argument, stating that "we're not going to get into this back-and-forth match." The court rejected the People's jurisdiction argument and, despite reservations, also agreed to consider new information submitted by defense counsel on the issue. The court then concluded that it could not find good cause to grant the discovery motion, even under the more lenient *Young* standard.

Defense counsel asked to make a record, and the court pointed out that her statements referenced the information that was already in the record before the court. However, he allowed her to proceed. She summarized the information she had provided, and stated, "We had the fact that a district attorney wrote in a sentencing brief nine times calling Mr. Lopez 'jealous' even though that was not the evidence." Defense counsel further stated, "I am concerned about sort of the flippant nature of the district attorney's response to this."

It was at this point in the proceedings that the majority's citation to the colloquy between the court and defense counsel occurred.

First, I disagree with majority's statement that "defense counsel never accused the prosecutor of explicit racism." (Maj. opn., *ante*, at p. 8). As the chronology (*ante*) makes clear, the defense attorney stated (1) that "the district attorney *asserts* and implies in its sentencing brief on at least nine separate occasions that Mr. Lopez was motivated by jealousy over an affair"; (2) that the prosecution used "coded language" in its pleadings; and (3) that defense counsel was "concerned that the district attorney's office *is promulgating*, perhaps even unconsciously, a racist stereotype about Latinx

8

or Chicano men." These statements can only be read to assert explicit bias, with slight concessions ("and implies" and "perhaps even unconsciously") that the alleged bias may have been implicit.

From the record, it appears that it was defense counsel who injected the allegedly racially-biased concept of jealousy into the proceedings. The People's supplemental sentencing memorandum never referenced "jealousy," but instead pointed out the undisputed facts at trial that Lopez had learned of his wife's affair and drug use and was "emotional." The defense's characterization of this memorandum morphed over time from an allegation that the prosecution "assert[ed] and implie[d]" jealousy as a motivation for the killing to defense counsel's flat-out assertion at a hearing that, "[w]e had the fact that a district attorney wrote in a sentencing brief nine times calling Mr. Lopez 'jealous' even though that was not the evidence." It was at this juncture, after the court had ruled, that the court expressed its disappointment with defense counsel's stance toward the prosecution.

Further, the California Code of Judicial Ethics, canon 3D(2), make clear that "[w]henever a judge . . . concludes that a lawyer has committed misconduct or has violated any provision in the Rules of Professional Conduct, the judge shall take appropriate corrective action . . . ." Among other things, the Rules of Professional Conduct provide that it is professional misconduct for a lawyer to make an intentional or reckless misrepresentation. (Rule 8.4(c).) Here, although not referencing a particular section of these rules, the judge stated that defense counsel had not "respect[ed] the rules of professional conduct." It appears that the corrective action taken by the court was to express the court's dismay and concern after the ruling on the motion and immediately prior to the conclusion of the hearing.

9

As noted in *Hawk v. Superior Court* (1974) 42 Cal.App.3d 108, 123, "A court has authority to control courtroom conduct of an attorney that is in flagrant disregard of elementary standards of proper conduct and to temper his speech in order 'to insure that courts of law accomplish that for which they were created—dispensing justice in a reasonable, efficient and fair manner,' "quoting *In re Buckley* (1973) 10 Cal.3d 237, 253–254, footnotes 21, 22. On a cold transcript, we cannot discern the tone and demeanor of defense counsel (or of the prosecutor, for that matter, who may have played a part in the "escalating rhetoric"); but it is clear that the judge was concerned about the effect of defense counsel's statements on the matter before the court.

Whether a different judge would have had a different concern and addressed the concern differently is not the issue before us. Instead, we are concerned with whether in the future proceedings in this case, this judge will impartially consider the merits of future proceedings under the RJA. I believe that a reasonable person would conclude that he will. For that reason, I dissent from that portion of the majority opinion directing reassignment to a different judge.

KELETY, J.